STATE, RESPONDENT, *v.* ALLISON, APPELLANT.

No. 8686.

Submitted June 25, 1948. Decided November 10, 1948.

199 Pac. (2d) 279.

122

W. E. Keeley, Maurice MacCormick, and Joseph A. Mc-Elwain, all of Deer Lodge, and George W. Farr of Miles City, for appellant. Mr. Keeley and Mr. MacCormick argued the cause orally.

R. V. Bottomly, Atty. Gen., and Fred Lay, Asst. Atty. Gen., both of Helena, and J. J. McIntosh, Co. Atty., and F. F. Haynes, both of Forsyth, for respondent. Mr. Lay and Mr. McIntosh argued the cause orally.

MR. JUSTICE CHOATE:

On June 5, 1946, defendant James A. Allison was convicted of the crime of involuntary manslaughter committed at his tavern in Rosebud County, Montana. The jury fixed his punishment at one year in the state prison. Judgment was entered accordingly and defendant appeals, this being the second appeal of the case. See State v. Allison, 116 Mont. 352, 153 Pac. (2d) 141.

*Challenges.* Defendant's first specification of error is that the court erred in overruling and denying defendant's challenge of the array and jury panel made after the names of 89 "accepted jurors" had been put in the trial jury box and after such persons had been accepted by the court for jury service. The facts pertaining to this challenge are as follows:

On February 4, 1946, Judge Flachsenhar made an order di-

recting a trial jury of 100 persons to be drawn to attend upon said court on the 11th day of March 1946 for the trial of this case and certain civil cases. The judge drew the names of said 100 jurors from jury box No. 1 and said list of jurors was delivered to the sheriff for service by registered mail. Forty-four of said persons appeared and were qualified and sworn as part of the panel of trial jurors for the term. Thereafter it appearing to the court that the number of jurors available from the list already drawn would be insufficient to obtain a trial jury, on March 4, 1946, the judge drew from jury box No. 1 the names of 75 additional persons of whom 45 having been legally summoned by the sheriff qualified and were sworn as the remainder of the jury panel. Accordingly it appears that a total of 89 jurors, 44 plus 45, were sworn in for said jury term on March 11, 1946. All of these jurors were examined on their general qualifications as jurors by the judge in open court on March 11, 1946, and they "attended in open court" as trial jurors for the March 11, 1946, term or session. On March 12, 1946, the court of its own motion discharged the entire jury panel and continued the trial of the Allison case. At the time the court discharged the panel of so-called "March jurors" because he concluded it was not a legal panel, no jury had been accepted in the Allison case, no evidence had been introduced and no objection or exception to the discharge of the so-called "March jurors" had been made or was ever made thereafter. After the adjournment of the term or session of March 11, 1946, the clerk of court deposited the capsules containing the names of the jurors above mentioned of which there were 88 after allowance of exemptions, in jury box No. 1 where they all remained until the later drawing of a jury to try said case. On April 5, 1946, Judge Flachsenhar ordered a trial jury of 175 jurors to be drawn and requiring them to attend a session of the court on May 13, 1946, for the trial of the Allison case alone. The judge drew the names of said 175 persons from jury box No. 1 which at the commencement of the drawing contained in addition to the other names therein all the names of the jurors

who had attended and served at the previous trial session (the so-called "March jurors"). The record discloses that in making up the jury which finally tried the case of State v. Allison at least 17 of these "March jurors" were again drawn and that two of them sat on the jury which finally tried the case. Counsel for defendant admit that in discharging all the jurors in attendance during the March term the court committed no error of any kind. They also concede that since no challenge to the array or panel constituting the March jury was made, the law is well settled that the right to make such a challenge is waived. But defendant contends that the names of the jurors who *attended and served* upon the March panel, upon being discharged therefrom, should have been placed in jury box No. 2 instead of jury box No. 1 and that the placing of said names in jury box No. 1 was reversible error entitling the defendant to a new trial or a dismissal of the charge against him.

The defendant was entitled to a jury panel drawn in substantial conformity with the requirements of the statute. State ex rel. Clark v. District Court, 86 Mont. 509-512, 284 Pac. 266; State v. Landry, 29 Mont. 218, 223, 74 Pac. 418; State ex rel. Root v. McHatton, 10 Mont. 370, 25 Pac. 1046; Dupont v. McAdow, 6 Mont. 226, 9 Pac. 925.

The question then is: *Did* the clerk of court violate the law in returning the names of the jurors who had attended the March term or session to jury box No. 1 instead of putting them in jury box No. 2 upon the discharge of the panel? Both parties to this appeal cite the case of State v. Landry, supra.

As to the exact question before us on this appeal the Landry case is not in point since it dealt only with the conditions under which a jury may be drawn from jury box No. 3. However, in the Landry case Mr. Chief Justice Brantly succinctly stated the provisions of our statute relative to the drawing of trial jurors. We quote the following from the opinion in that case, substituting only the present Code section numbers [29 Mont. 218, 74 Pac. 419] : "Under the statutes [sections 8899, 8905 and 8907, Rev. Codes of Montana [1935] it is the duty of the clerk of the

district court to keep three jury boxes, designated as boxes Nos. 1, 2, and 3. In box No. 1 the clerk is required to deposit and keep the ballots containing the names on the jury list prepared by the jury commissioners for the current year. [(Secs. 8896-8900, Rev. Codes 1935.)] This list comprises the names of the regular jurors. (Id. Sec. 8901.) In box No. 2 the clerk must deposit from time to time and keep the ballots containing the names of all persons who have served during the year. (Sec. 8905.) Box No. 3 is to contain the names, upon duplicate ballots, of all competent jurors residing in the city or town where the court sits. (Sec. 8907.)"

It is apparent from the above sections of our statute that jury box No. 1 comprises the names of the *regular jurors* which are made up from the jury list prepared by the jury commissioners for the current year. It is from jury box No. 1 that jurors are selected from the whole body of qualified jurors in the county. Resort to jury box No. 2 is had only when there are insufficient names of jurors remaining in jury box No. 1. Drawing from jury box No. 3, sometimes referred to as the "town" jury box, is had only under the conditions stated in section 8911 which do not appear in this case.

Now what lawful disposal *could* have been made by the clerk of court of the 88 names of "March jurors" which were put back into jury box No. 1 at the close of the March session? He could not have destroyed these ballots; obviously he could not legally have put them in jury box No. 3; neither could they have been put in jury box No. 2 *unless* such disposition was authorized by section 8905. That section is designed to prevent persons who have already performed jury service from being again called on to render such service until all the jurors in box No. 2 have been drawn and have served.

The language of section 8905 is, we think, plain as to its meaning. In describing what ballots shall be placed in jury box No. 2 after the adjournment of the session, the section twice uses the word "served." Once the section refers to the names of those who "attended and served" and once it refers to the names of

those who did "not appear and serve." Be it noted, however, that in both instances it is those who have *served* and not those alone who attended or appeared whose names are to be put in jury box No. 2. Unless therefore the 88 jurors who were summoned as a part of the panel of March jurors can be said to have "served," then it would clearly have been error for the clerk to have put back the names of said jurors in jury box No. 2.

What is meant by the word "served" as used in said section 8905 when it speaks of the names of those who "attended and served" or the names of those who "did not appear and serve"? The Colorado case of Waite v. People, 83 Colo. 162, 262 Pac. 1009, is the leading case which we have found or which has been cited by counsel in which the courts have passed on what is meant by "serving" as a trial juror. Colorado had a statute under which any person summoned in any way to serve as a juror in any district or county court who shall have served as a juror in either of said courts, at any prior term within one year next preceding "shall have a sufficient excuse for such person from service, and may also be ground for challenge." C. L. Colo. 1921, sec. 5882.

The persons who had been summoned to attend as jurors at the specified term of court but who did not sit in the trial of any case were challenged under the above statute. The court held that said persons had not served within the meaning of the above statute unless they had actually sat in the trial of a case. In support of its conclusion the Colorado court cited a similar holding in the Kansas case of State v. Lowe, 56 Kan. 594-597, 44 Pac. 20, holding that the juror must have sat as such in the trial of a case. The court also cited the Missouri case of State v. Rose, 271 Mo. 17, 195 S. W. 1013, holding the right of challenge to be limited to the term of actual service of the juror and not to the period of his attendance upon the court under the venire.

We are satisfied that the majority rule is correctly stated in the Waite case, supra, rather than in the special concurring

opinion of Mr. Justice Butler in said case and we approve the majority rule.

In 35 C. J., page 254, section 194, the author of that treatise, discussing the subject of juries, says: "Actual prior service only disqualified a juror under the operation of these statutes [statutes relating to the disqualification of jurors by a prior service]. The juror must have actually sat in the trial of a case, and not merely have been summoned." Citing authorities in the accompanying case notes 74 and 75 of which the following are illustrative: State v. Lowe, supra; Stuard v. State, 6 Okl. Cr. 94, 116 Pac. 204; Humphrey v. State, 74 Ark. 554, 86 S. W. 431; Burnett v. Roanoke Mills Co., 152 N. C. 35, 67 S. E. 30. See, also, 50 C. J. S., Juries, sec. 150, notes 95 and 96.

We are of the opinion that on the adjournment of the March term the court properly directed the clerk to return to jury box No. 1 the names of the 88 March jurors who had attended the session pursuant to the sheriff's summons but who had not been called upon to serve and had not served as trial jurors during said term and that the names of said persons did not belong in jury box No. 2. It should also be noted that the effect of returning the names of these jurors to box No. 1, which contained the regular jurors, was to increase rather than diminish the number of names from which the jury to be chosen for the trial might be drawn, thereby giving a wider choice of jurors, following the evident intent and purpose of the legislature, namely, the "guaranty to every person a trial by jury called by lot from the whole body of qualified jurors in the county." State v. Landry, supra, 29 Mont. at page 224, 74 Pac. at page 420.

*Challenge of Juror Leemhius.* Defendant's specification No. XLIV, assigns error on the part of the trial court in refusing to sustain a challenge for cause to the individual juror Jacob Leemhius. It was developed from this prospective juror on his voir dire that he was an uncle of the wife of James Hall who was a brother of Babe Hall, the man whose killing is involved in this action. Concededly the statute does not make the relationship of a juror by marriage of his niece to a brother of the deceased

grounds for challenge. However the defendant contends that on his voir dire this prospective juror displayed bias and prejudice against the defendant sufficient to warrant his challenge for cause. On the juror's voir dire the following examination occurred:

"Q. If the situation was reversed and you or some friend or relative of yours was on trial and the jury was called in the box and being examined as to his qualifications and put in the same situation you are in in your frame of mind—well you are the only one that does know it, would you be willing to be tried by the juror in the same relationship as you—or do you know? A. Well I don't know about that. A fellow should give a man a fair trial whoever he is.

"Q. Well if the situation was reversed you would feel a little hesitancy, wouldn't you? A. I would give a man a fair trial.

"Q. That isn't the question. I want to know if the situation was reversed and either you or some friend or relative of yours was being tried and a juror was called in the box sustaining the same relationship and having the same mental feeling as you have, would you be willing to be tried by that juror? A. Oh, I don't know.

"Q. You would have some doubt? A. A fellow shouldn't. You should give him a fair trial no matter who it is.

"Q. But there is some feeling of the relationship— A. It ain't with me.

"Q. But you would be willing to be tried? A. Yes.

"Q. Put it this way, a little more definitely. If you was being tried and Allison was in the jury box being examined and that same relationship existed, would you be willing to be tried? A. Well, we may not all feel alike but I think every man should get his fair trial and every man should be on the jury if he is called on one.

"Q. If Allison—if the situation was reversed and you was being tried and Allison was in the jury box and felt the same as

you do now, sustained the same relationship to the deceased, would you want to be tried? A. I couldn't say about that.

"Q. You have some reservation about that? A. I don't know about that.

"Mr. Farr: We submit a challenge for cause if the Court please.

"Mr. McIntosh: We resist it.

"Mr. Farr: This juror is not clear as he should be on that.

"Mr. McIntosh: The challenge is resisted.

"The Court: Q. Mr. Leemhius, the question that Judge Farr wanted you to answer if you could was that, if a man or a woman had the same relationship to the decedent as you have now was called and examined as a prospective juror as you are being examined, and you were the defendant, would you be willing to be tried by such a person who was in the same state of mind as you are now and maintain the family relationship to the decedent—would you be willing to submit your case to such a juror? Do you understand? A. Me be related to Mr. Hall? Is that it?

"Q. If he doesn't understand that—I will have the court reporter repeat it to him. In other words, Mr. Leemhius, do you think that person could fairly try such a case against you? A. Well, I don't know.

"The Court: There is a doubt in your mind? There might be with some of them? You think there is a doubt? A. No. I don't think there is.

"Q. Do you think such a person could try the case fairly? A. I think so."

It is a difficult matter at best to ascertain the real state of mind of a prospective juror with respect to detecting the existence of bias or prejudice against one accused of crime. For that reason this court has said (State v. Russell, 73 Mont. 240, 249, 235 Pac. 712, 715) that the determination of the qualification of a juror to serve in a case before the court "must be left largely to the sound discretion of the trial court." Again in State v. Huffman, 89 Mont. 194, 296 Pac. 789, 790, this court

said: "* * * the trial court is the judge of the weight to be given to the testimony adduced on a voir dire examination." True, there are cases holding that when a witness has once admitted bias his subsequent statements that he can consider the evidence impartially should be viewed with caution. But granting the need for careful scrutiny of the testimony of a witness who has first said "no" and then said "yes," it still remains the province of the trial court to decide where the truth lies and with that determination the appellate court will not interfere unless a clear abuse of discretion is shown. State v. Russell, supra.

Applying these principles of law to the statements made by Leemhius, it is our opinion that the answers of this juror disclosed a *misunderstanding* of the questions put to him by counsel for defendant and by the judge, rather than bias or prejudice against the defendant. What the court and counsel were trying to find out was whether the fact of Leemhius' being an uncle of James Hall's wife or his state of mind in respect to the case generally would prevent him from trying the case fairly. These two elements, relationship and general attitude of mind, were unfortunately embodied in one double question which was repeated to the juror several times and which embodied the hypothetical assumption that Leemhius was on trial instead of Allison and sought answer to the question whether he would be willing to be tried by a juror who felt as he did and was related as he was. The first time the question was asked him the juror replied, "I don't know about that. A fellow should give a man a fair trial whoever he is." The second time he said, "Oh, I don't know." A third time he said when asked about his feeling arising from relationship that he *would* be willing to be tried. The fourth time the juror said, "I couldn't say about that. I don't know about that."

Counsel for the state then challenged for cause and the court took a hand in the inquiry. The first question put by the court was evidently not understood by the juror as indicated by his reply, "Me be related to Mr. Hall? Is that it?" and was clearly not responsive to the court's question. Again the court put the

question to him, "Mr. Leemhius, do you think that person could fairly try such a case against you?" and Leemhius said, "Well, I don't know." Then the court asked if there was a doubt in his mind. "You think there is a doubt?" and the juror said, "No. 1 don't think there is," and to the final question put by the court, "Do you think such a person could try the case fairly?" the juror said, "I think so."

The last two questions put to the prospective juror, if given credence by the court (as they were), taken in conjunction with his apparent misunderstanding of the questions put to him in the earlier part of his examination, were sufficient to sustain the court's order overruling the challenge. Attention is called by counsel for defendant in a separate memorandum to the recent New Mexico case of State v. Sims, 51 N. M. 467, 188 Pac. (2d) 177. In that case it was held, just as this court has held, that the trial court is necessarily invested with a wide discretion in the superintendence of the process of impanelling a jury and that in the absence of unusual circumstances the appellate court will not disturb its exercise. Citing State v. Burrus, 38 N. M. 462, 35 Pac. (2d) 285.

The court held, however, that in the Sims case there *was* doubt as to the juror's feelings and that the trial court erred in forcing a juror upon the defendant after he had exercised all his peremptory challenges. In the case at bar, however, the defendant had three peremptory challenges left at the time the court overruled the challenge against the witness Leemhius and immediately following defendant's taking of exception to the court's overruling said challenge, the defendant exercised his sixth peremptory challenge to remove said juror. In the case at bar the court did not, as in the Sims case, force the objectionable juror upon the defendant after the latter had exhausted all his peremptory challenges, and so far as prejudice to the rights of the defendant is concerned, Leemhius did not sit on the jury which tried the defendant. The fact that defendant regarded jurors Jensen and Ronnin as undesirable gave him no right to have Leemhius excused for bias in order that defendant might

get rid of one of two other jurors, no showing having been made that those prospective jurors were not qualified.

*Gun and Bullets As Evidence.* Specifications of error Nos. 2, 3, 4, and 5, relate to the admissibility of defendant's revolver and the bullet which was extracted from the body of deceased. These exhibits, state's exhibit No. 1, defendant's revolver and state's exhibit No. 2, the bullet which caused the death of decedent, were introduced in evidence. This the defendant assigns as error. The record discloses the following facts: On the morning of July 26, 1942, under-sheriff Dowlin went to the Allison Tavern. There he discovered the body of deceased, Babe Hall. Witness then "looked for the gun" and found it under the north end of the bar along with a box of unexploded shells and some exploded shells lying on the floor. The gun which the under-sheriff discovered was a Colt .38 and was fully loaded with Smith and Wesson special .38 caliber shells. This gun belonged to the defendant Allison as he himself had registered it at Hathaway.

Exhibit No. 2, the bullet which was extracted from the body of the deceased upon the autopsy was identified by the witness Baughman, special agent for the F. B. I., as a bullet which had been fired from a gun having riflings similar to those in exhibit 1, the gun found in Allison's bar, owned by the defendant. The witness testified, however, that the bullet (exhibit 2) did not show individual characteristics sufficient to permit a positive identification as having been fired from exhibit 1. The witness testified, however, that there were no other American revolvers of American manufacture other than Colt having that type of rifling. Thus the following facts are disclosed: Babe Hall was shot and killed by a bullet of the caliber known as .38 special of the type known as a Lubaloy bullet, that type being manufactured by the Western Cartridge Company. The bullet which killed decedent bore rifling marks such as would be left by a Colt revolver and which could have been left by a Colt revolver of the type owned by the defendant and found on his premises. No one except the defendant is shown to have had a gun that

evening at the scene of the crime and no other gun of any sort or kind was mentioned in the evidence. Also it should be noted (testimony of witness Vassau) that the night of the homicide Allison "did a little shooting" through the ceiling and several shots at least through the south wall of his saloon. This shooting at random was apparently done in a spirit of high humor, as well as reckless disregard of the safety of defendant's guests, and was inspired by the sight of the Mexicans who were in the bar room, ducking when the shots were fired. "The Mexicans," said the witness Vassau, "were scared quite a bit. I think two went under the table. One dropped down in front of the bar and one went out the front door."

This witness also thought "it was about time to leave" when Allison shot through the wall so low that witness feared he might have shot through the Armstrong car in which there were two children.

The applicable rule of law is stated by this court as follows in State v. Harris, 66 Mont. 34, 213 Pac. 215, 217: "* * * the general rule being that weapons found at or near the place of arrest are properly admitted in evidence as a part of the history of the arrest, and as bearing on the crime, although not clearly shown to have been the property of the accused or used in the commission of the crime."

"Weapons, tools, bullets, instruments, or other articles which appear from other evidence to have been employed in the commission of the crime are admissible in evidence." State v. Byrne, 60 Mont. 317, 325, 199 Pac. 262, 264.

Volume 16 C. J., at page 618, section 1225, states the law as follows: "The weapons, bullets, tools, instruments, or other articles which appear from other evidence to have been employed in the commission of the crime are admissible in evidence * * * to warrant the admission in evidence of an instrument or weapon as the one with which the crime was committed, a prima facie showing of identity and connection with the crime is necessary and sufficient; clear, certain, and positive proof is

not required.'' Citing authorities in the accompanying case notes 34 to 36. See, also, 22 C. J. S., Criminal Law, sec. 712.

Nichols Applied Evidence, Volume V, page 4716, section 9, says, ''The weapon with which the homicide was committed ·is admissible, as is one found in the house where the body of deceased was discovered and which might have caused the death.'' Citing authorities in the accompanying case notes 59 and 60. Volume IV of the same text, at page 3276, section 341, states: ''Weapons used or found on the premises are themselves admissible in a proper case.''

Defendant admits that exhibit 2 having been clearly· identified as the missile that caused Hall's death, was admissible. However, he contends that ''the court should have carefully guarded against any chance of the jury believing that the two exhibits had been admitted for the purpose of connecting the defendant with the homicide.'' We think the court should not have so limited the purposes for which exhibits Nos. 1 and 2 were admitted and that it would have been an invasion of the province of the jury if the court had given defendant's requested instruction No. 47 or one of similar import. The evidence though circumstantial was sufficient to justify the jury in finding that the bullet which was extracted from Hall's body not only could have been but *was* fired from defendant's revolver.

As to the *weight* of the bullet, the evidence is that it was badly deformed. It had passed through a screen door and a wooden door, and had knocked out the decedent's teeth as described by the doctors who conducted the autopsy. In the course of its contact with those obstructions, we cannot say it was impossible for the bullet to have lost the difference between 133 and 158 grains in weight. In any event, this difference in weight presented a question for the jury.

*Conviction of Involuntary Manslaughter.* The defendant was charged with the crime of murder in the second degree. The court advised the jury that it had taken from their consideration the question of murder in the second degree and that the

only question remaining for their consideration was the guilt or innocence of the defendant of the crime of manslaughter. In its instructions to the jury the court gave the statutory definition of manslaughter, both voluntary and involuntary. Defendant concedes that *voluntary* manslaughter *is* a lesser degree of the crime charged in the information but insists that involuntary manslaughter was not included in the information which charged murder in the second degree and that therefore the defendant could not be convicted of involuntary manslaughter of which the jury found him guilty.

In support of counsel's contention they cite a quotation from Wharton's Criminal Evidence, 10th Edition, Vol. II, section 583e, paragraphs 1210-1214. This quotation seems to us to lend support to the state's theory of the law and the decisions of this court on the same point. It reads: "Hence, on a charge of homicide, there may be a conviction * * * of manslaughter, voluntary or involuntary, * * * provided, however, that the indictment necessarily covers the included degrees in the general charge of the greater." This is the situation in the case at bar. The general charge of murder in the second degree necessarily included all lesser degrees of the crime charged which, in contemplation of law, are deemed to be comprehended therein without the necessity of inserting in the original information all the allegations necessary to constitute voluntary manslaughter. To the same effect is the quotation cited by appellant from Wharton's Criminal Law which is now found in the 12th Edition of that work, Vol. I, page 666, section 427. Our statute, section 10959, Revised Codes of Montana 1935, while it defines voluntary and involuntary manslaughter, makes no distinction between them in so far as the allegations necessary to charge manslaughter are concerned.

Defendant's contention on this point is also concluded by the following language of section 11868 of our Code: "Upon the trial of an indictment or information, the defendant may be convicted of the crimes charged therein, or of a lesser degree of the same crime, *or of any crime included in the crime charged* * * *"

(Emphasis supplied.) See also State v. Gondeiro, 82 Mont. 530, 268 Pac. 507 and cases cited therein.

*Instruction on Voluntary Manslaughter.* It is next contended ██ that the defendant was prejudiced by the court's instructing the jury on voluntary manslaughter and failing to take this issue from the jury. The court instructed the jury in the language of the statute, sec. 10959, Rev. Codes 1935, on manslaughter and in so doing gave the statutory definition of manslaughter *both* voluntary and involuntary. Assuming arguendo the correctness of counsel's contention that there was no evidence of voluntary manslaughter in the case, we cannot attribute prejudicial error to the defendant from the fact of the court's failure to withdraw voluntary manslaughter from the jury's consideration in view of the circumstances that the jury did *not* find the defendant guilty of that crime but found him guilty of involuntary manslaughter only. Of this the defendant may not complain. Had the jury found him guilty of voluntary manslaughter a different situation might be presented. It seems to us a far-fetched conclusion also to assume as contended by appellant that such a verdict was a "compromise" one simply because the jury were permitted to consider both kinds of manslaughter.

*Conviction of Involuntary Manslaughter.* It is next contended ██ that the defendant could not have been guilty of involuntary manslaughter. This argument is set forth with considerable elaboration in defendant's brief. We do not consider it to have merit. The evidence shows that decedent Hall declined to accompany his wife home around 2:00 on Sunday morning when she left with her two children and friends. Thereupon Allison had invited Hall to stay or "bunk" with him for the night. Allison therefore had reason to expect that Hall would be coming into bed sometime that morning. Under these circumstances for Allison within his tavern, to take a .38 caliber revolver and shoot through the screen and door of his bedroom, striking a human being on the other side of the doors, as the jury was warranted in finding, was, to say the least, and

on the theory most favorable to defendant, "the commission of a lawful act without due caution or circumspection." In State v. Powell, 114 Mont. 571, 576, 138 Pac. (2d) 949, 950, we stated the rule relative to imposing criminal liability for a homicide caused by negligence, as follows, quoted from 26 Am. Jur. 299: "The authorities are agreed, in the absence of statutory regulations denouncing certain acts as criminal, that in order to impose criminal liability for a homicide cause by negligence, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard for human life or an indifference to consequences."

We think the reckless and negligent acts shown in the record and which the jury found were those of the defendant Allison were ample to impose criminal liability.

*Refusal of Defendant's Offered Instruction No. 9.* This instruction embodied a part of section 10963 of our Code, which defines excusable homicide, and a part of sub-division 6 of section 10729 defining who are capable of committing crime. While the trial court refused to give defendant's offered instruction No. 9, it did give subdivision 6 of section 10729 by which it instructed the jury that persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence, are not capable of committing crime. The form of the offered instruction was also objectionable. We think no reversible error was committed by the court in refusing this offered instruction in view of the others given.

We also find no error in the court's refusal of defendant's offered instructions Nos. 19 and 20 which were mere amplifications of the law concerning presumption of innocence and reasonable doubt upon which the court had already instructed.

Also we regard as misleading and inapplicable to the facts in this case the statement in defendant's offered instruction No. 20 that "When the case against the defendant is made up *wholly of a chain of circumstances* and there is reasonable doubt as to any fact, the existence of which is essential to establish guilt, the defendant should be acquitted."

*Testimony of Florence Frier.* Appellant attacks the testimony of the witness Florence Frier Yablonski (specification of error No. 27), claiming that it is so inherently improbable and incredible as to be unworthy of belief and should have been entirely disregarded by both the court and the jury, particularly that portion of her testimony wherein she stated that she heard someone say, "Come on Jim, let me in." The truthfulness of this piece of testimony depends in large part on whether Florence Frier did or did not go to and return from the dance at Rancher in company with five boys and four girls who attended that function and on the return trip got back to the Frier home at the section house somewhere between 5:00 and 5:30 Sunday morning following the homicide.

Florence Frier herself positively testified on three occasions and refused to say otherwise on cross-examination, that she did *not* go to the dance at Rancher that evening July 25-26, 1942. She so testified at the coroner's inquest; also on the former trial of the case, and on the last trial of the case. On the last trial she stated that she went to bed between 9:00 and 9:30; that she awakened about 3:00 in the morning when her father came home from Forsyth; that she heard her sister come in from the dance around 5:30 and that it must have been around 5:00 or at any rate sometime between 3:00 and 5:00 in the morning that she distinctly heard a voice say twice, "Come on Jim, let me in." Of course, in the light of the above testimony, if Florence Frier did go to the dance and did come home with the dancing party around 5:00 or 5:30 in the morning, the time testified to by the boys who went to the dance, then her testimony might be questioned. But there *is* sufficient confirmation of Florence Frier's

testimony that she did *not* go to the dance to have warranted the court in submitting this issue to the jury.

Florence Frier's thrice repeated statement that she did *not* ▮▮▮▮ go to the dance but was at home in bed when she heard the voice testified to, is corroborated by her sister Eleanor Frier Harstead, who testified that Florence "stayed home that night." Florence's testimony is also corroborated by that of Charles Kowis who said on cross-examination that there was only *one* Frier girl whom the boys left off at Cartersville. Peter Schiffer also testified that Eleanor Frier was one of those who went to the dance but made no mention of Florence being in the party. Lillian Rieger, one of the girls who went to the dance, testified that Florence Frier did not accompany the party to Rancher but was home in bed but awake when Lillian Rieger got there on the return from the dance. Those who contradicted Florence Frier's testimony that she did not go to the dance were Paul Schiffer, Bob Rogers and Charles Kowis on direct examination but not on cross. The above condition of the record presents, it is true, a conflict in the testimony as to whether Florence Frier was telling the truth when she said she did not go to the dance at Rancher; that conflict was for the jury and the record does not present any such discrediting of the witness' testimony nor any such self-contradiction in other respects, notably her testimony at the inquest, as would have warranted the court or jury in wholly disregarding her testimony.

The question as to the value of the voice tests and whether Florence Frier could have heard the voice say, "Come on Jim, let me in," was also one for the jury as was the question as to the value of the "tests" made on behalf of both the state and defendant to establish the visibility of objects as seen at the side of a passing automobile and while the auto was traveling at different speeds.

*Testimony of Boys.* Appellant also attacks as incredible the ▮▮▮▮ testimony of the four boys relative to seeing a man standing up to the door on the east side of the Allison tavern as the boys drove by on their way home from the Rancher dance.

Paul Schiffer, one of the four boys, said they were driving east toward the Allison tavern, going about 20 or 25 miles an hour and he estimated the distance of the car from the road to the Allison tavern at about 25 or 30 feet. The witness testified that it was just light enough so you could see. "You could see the tavern fairly good." They saw a man at the east side of the tavern standing up at the door of the tavern on the east side of the building. The car in which the boys were riding was "just a little ways by." "We just glanced over and seen him." The man was about medium height and "looked like he had a light shirt on and dark trousers." Bob Rogers substantially corroborated the above testimony. He fixed the time when they left the girls off at the section house at about 5:30 and estimated the distance from the car to where the man was standing at from 75 to 100 feet. Charles Kowis gave substantially the same testimony as Schiffer and Rogers except that he said that he "saw an object that looked like a man" standing against the door on the east side of the building. As they went by the Allison tavern, somebody in the car said, "There is a guy over there."

He also said "It was just breaking day and you could see a ways pretty good." Peter Schiffer, a brother of Paul Schiffer, corroborated the latter.

We do not consider the testimony of these four young men as preposterous or absurd nor at variance with anything of which the court should have taken judicial notice, nor do we think it constituted mere "swearing" instead of credible swearing as argued by appellant.

Counsel suggests that the defendant might have been found guilty of involuntary manslaughter even if all the above testimony of the four boys as well as that of Florence Frier had been disregarded. But they contend that "we cannot take away the impression it had on the jury by the presiding judge permitting it to go into evidence over the objection of the appellant." It is of course impossible for us to tell what view the jury took of the above testimony or how much weight they attached to it. Hence we cannot say that the action of the trial court in admitting this

evidence created a wrong impression on the jury or caused them to attach undue weight to it. We are of the opinion, however, that if the testimony of the four boys and that of Florence Frier had been stricken and the jury admonished to disregard same, a conviction of involuntary manslaughter would have been warranted on the other testimony in the record.

*Instruction No. 28.* Appellant complains that this instruction told the jury that the state must prove the "intent" alleged in the information and since there was no evidence of intent on the part of the defendant to kill decedent Hall, therefore the jury in finding the defendant guilty of involuntary manslaughter "failed to follow the court's Instruction No. 28." We perceive no merit in this contention. It is true the original information charged the crime of murder in the second degree and properly alleged an intent to kill and murder. When, however, the court took the issue of second degree murder out of the case and submitted the case to the jury on the question of manslaughter only, proof of an intent to kill and murder was no longer a necessary ingredient of the offense.

While the trial court might properly have modified Instruction No. 28 to accord with its action in withdrawing the charge of second degree murder, this conviction should not be set aside merely because the court failed to modify instruction No. 28 to accord with the law governing manslaughter especially when it appears that no prejudice resulted from such omission by the trial court. The instructions, moreover, are to be considered as a whole. "It is a well-settled rule in this jurisdiction that instructions must be considered as a whole, and that, if they fairly tender the case to the jury, it is not reversible error that one or more of the instructions, standing alone, is not as full or accurate as it might have been." State v. Darchuck, 117 Mont. 15, 156 Pac. (2d) 173, 178, citing Koppang v. Sevier, 106 Mont. 79, 75 Pac. (2d) 790-793.

*Insufficiency of Evidence.* In our opinion the trial court committed no error in refusing the defendant's motion for a new trial because of alleged insufficiency of the evidence to support

the judgment or because the verdict was allegedly contrary to the law and the evidence. We do not consider it necessary to prolong this opinion by a review of the testimony. The trial court's ruling on the motion for a new trial is accompanied by a statement of the evidence which, while largely circumstantial, was considered by the trial judge to be sufficient to sustain the judgment and we concur in that conclusion.

*View of premises.* The court permitted the jury to view and ▮▮▮ inspect the tavern premises. This act is assigned as error. Our statute, sec. 11996, Rev. Codes 1935, provides that the court may order a view of the premises *"when in [his opinion]* it is proper that the jury should view the place in which the offense is charged to have been committed * * *"* See also sec. 9350, Rev. Codes 1935. This is a matter which rests entirely in the discretion of the trial court and we will not interfere with the exercise of that discretion except in case of manifest abuse. No such abuse appears in this case. The fact that the place had accumulated dirt which had been hastily swept away, that doors had been replaced and the "view was bleak and morbid," furnishes no ground for interference by this court with an order permitting a view of the premises.

*Defense of Habitation.* In its so-called defense of habitation, ▮▮▮ Instruction No. 23, the court gave the jury the law that if at the time of the homicide defendant as a reasonable person believed it was necessary for him to fire the shot through the door in order to prevent a wrongful entry or a trespass upon his habitation, then he had the right to act upon such appearances and fire said bullet through the door even though he was in no actual danger. Defendant urges that this so-called defense of habitation instruction should have been accompanied or amplified by an instruction giving a definition of what constitutes *burglary.* With this contention we cannot agree. Burglary is the entry of a house "with intent to commit grand or petty larceny or any felony." Sec. 11346, Rev. Codes 1935. Burglary is but one form of wrongful entry or trespass. It was unnecessary for the court in giving Instruction No. 23 to particularize

as to the many kinds of wrongful entry or trespass which may be committed, including burglary.

*Voice and Sound Tests.* Complaint is made that the court erred in permitting the state to introduce testimony concerning voice and sound tests upon rebuttal; that said testimony should have been introduced as a part of the state's case in chief. The order in which proof is admitted at the trial is within the sound discretion of the trial court. Exchange State Bank of Glendive v. Occident Elevator Company, 95 Mont. 78, 24 Pac. (2d) 126, 90 A. L. R. 740; Spurgeon v. Imperial Elevator Company, 99 Mont. 432, 43 Pac. (2d) 891.

Aside from the rule above stated, it does not appear to us that the defendant was prejudiced by the fact that the state was permitted to introduce said evidence in rebuttal. The error, if any, was harmless.

*Testimony of Dr. Tarbox.* The witness Dr. Tarbox testified that he had a conversation with Allison at Cartersville on the evening of July 26, 1942, while there to perform an autopsy on the body of Jim Hall. The witness stated that defendant ''was running around and in fact he was about half tight and you couldn't shut him up.'' ''He came around and volunteered the information.'' ''He was not asking me any question. He was talking and doing some drinking.'' ''He had not been advised of his constitutional rights.'' In response to the question, ''Tell us what statements the defendant made to you without any question, just voluntary statements,'' the witness answered at some length, telling of various statements made to him by Allison about what had happened at the Allison tavern the night before, including the following testimony: ''I asked him how it came he stayed there. He said he, Babe and his wife, had had a little argument and that he had said, that Allison had told me that he had told the family, this group of friends that were out with Babe, to go on home that he would take care of him and that he could sleep with him.''

The state contended that the testimony was admissible as part of the res gestae and apparently the trial court admitted it

upon that theory over defendant's objections. We think it is unnecessary for us to pass upon the question whether the defendant's declaration made to Dr. Tarbox were "part of the transaction" within the purview of section 10511, Revised Codes of Montana, 1935, and hence admissible as res gestae. "If testimony is otherwise admissible, it is immaterial whether it is admissible as res gestae." Underhill's Criminal Evidence, 4th Ed., page 363, section 197, citing Myers v. State, 105 Tex. Cr. 426, 289 S. W. 49.

We are of the opinion that the above testimony of Dr. Tarbox was admissible as an admission of the defendant against interest tending to incriminate the accused. The law relative to such admissions is stated in Underhill's Criminal Evidence, supra, page 501, section 262, as follows:

"*Admission against Interest.* Any voluntary statement by one accused of or suspected of crime, relating to some particular fact or circumstance and not the whole charge, which indicates a consciousness of guilt and tends to connect him with the crime charged and to incriminate him is admissible as an admission against interest." Citing many supporting authorities including the two Montana cases of State v. Ray, 88 Mont. 436, 294 Pac. 368, and State v. Ludwick, 90 Mont. 41, 300 Pac. 558.

Our own statute also supports the rule above stated. Section 10531, subdivision 2, reads as follows: "*Facts which may be proved on trial.* * * * evidence may be given upon a trial of the following facts: * * *

"2. The act, declaration, or omission of a party, as evidence against such party."

The theory on which the trial judge admitted the evidence in question is wholly immaterial for in our opinion Allison's declarations to Dr. Tarbox were in fact against the interest of the accused and tending to incriminate him, as is clearly apparent from the record. Such declarations show that Allison had reason to expect Hall's coming to his bedroom and should therefore have been doubly careful about shooting firearms at an hour and place which might have endangered the life of his guest.

This appeal has necessitated examination of a transcript 1,348 pages in length and the consideration of the briefs of appellant's counsel, 258 pages long and presenting 44 specifications of error. The untimely death of the court reporter who took the shorthand notes of the proceedings and testimony at the trial has necessitated numerous extensions of time for preparing and presenting the record an appeal to this court, all of which we have considered it our duty to grant in the interest of a full consideration of defendant's appeal. Of the 44 specifications of error, 14 of them have been discussed in this court's opinion. The remaining 30 specifications of error we have found without sufficient merit to deserve separate treatment in this opinion but all of them have been given consideration and have been rejected as without merit.

It may be stated in general summary of our view of this appeal that none of the alleged errors relied on by appellant were prejudicial to the substantial rights of the defendant and none of them were of such gravity as to warrant a new trial or a reversal of the judgment. "* * * errors not substantially prejudicing accused are not available as grounds for reversal." 30 C. J., "Homicide," p. 440, sec. 701. See, also, 41 C. J. S., Homicide, sec. 423.

The jury's verdict must be sustained.

Judgment affirmed.

Mr. Chief Justice Adair, and Associate Justices Gibson, Angstman and Metcalf, concur.

Rehearing denied November 30, 1948