STATE, Respondent, *v.* SIMON, Appellant.

No. 9168.

Submitted May 28, 1952. Decided August 16, 1952.

247 Pac. (2d) 481.

Mr. F. F. Haynes, Forsyth, and Mr. Arthur R. Meyer, Billings, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Charles V. Huppe, Mr. H. M. Brickett, Asst. Attys. Gen., Mr. Charles B. Sande, County Atty., Mr. Jerome Anderson, Deputy Co. Atty., Billings, for respondent.

Mr. Meyer, Mr. Brickett and Mr. Anderson argued orally.

MR. JUSTICE METCALF:

Harry Moore lived on a farm three and a half miles southeast of Laurel, Montana. On the evening of November 26, 1951, he was at home with his wife, his little boy, and two of his daughters, Margaret and Sheryl. Mr. Moore went to bed that evening about 8:00 p. m. Later, at about 9:00, Moore was awakened by Sheryl who said to her father, "Some boys are out there." Mr. Moore went to the door where he saw three boys and a short distance away in the shadows were another group of boys. One of the boys at the door asked, "Is Margaret there?" Moore ordered them off the place and told them to "shut the gate behind them." The boys went away. They returned a short time later and threw rocks at Moore's house, knocking off paint and breaking two windows. Moore again went to the door and said, "I'm going to have you arrested for this." The response he received out of the darkness was, "By God, you son of a bitch, you, we'll get you." The attackers then left.

Forty-five minutes to an hour later Moore saw car lights coming up the lane toward his house. Fearing further trouble Moore got a battered old .12 gauge shotgun and stepped outside where he stationed himself behind a tree near the house. The car stopped and within a few minutes a barrage of .22 bullets and shotgun pellets struck the house hitting the sides of the house, the chimney, breaking windows and penetrating the door. Moore returned the fire and after firing several shots at the assailants went back into the house for more shotgun shells. While the bombardment was going on Mrs. Moore and the children took refuge in a root cellar behind the house. After

Mr. Moore had obtained more ammunition he took a position behind the root cellar and again fired and the boys left.

Margaret and her brother stayed in the root cellar for about half an hour and then went to a neighbor's house a half mile away for aid. The neighbors had no phone but took Margaret and her brother to Laurel to the police station where they reported the shooting. The policeman in charge called the sheriff's office and then drove Margaret and her brother back to the Moore house. Shortly thereafter a deputy sheriff from the sheriff's office arrived and took charge of the investigation.

Margaret was able to identify one of the boys involved and heard another addressed as Wally. It was established that the defendant was nicknamed Wally and was commonly known by that name. The following day a detective from the Billings police department interrogated the defendant in the presence of the deputy sheriff and Mr. and Mrs. Simon. There was also another boy present who had participated in the alleged assault. The defendant admitted that he had been at the Moore farm at Laurel when the incident occurred and that he had fired a gun in the direction of the Moore home. Later, on cross-examination at the trial, it was developed that the defendant had never told the officers what kind of a gun he had fired or where he stood at the time he was firing toward the Moore home.

Shells from a .16 gauge shotgun and a .20 gauge shotgun and from two .22 calibre rifles were found along the county road from which the firing came. These shells and cartridge cases were sent to the F. B. I. laboratory in Washington and ballistic experts examined them and at the trial identified them as having come from guns introduced into evidence which were found at the home of another one of the boys who was in the party.

The defendant was charged with assaulting Harry Moore by shooting "towards and in the direction of said Harry Moore with weapons likely to produce grievous bodily harm, to-wit: one .16 gauge shotgun, one .20 gauge shotgun and two .22 rifles," in violation of R. C. M. 1947, sec. 94-602, subd. 4.

The first information charged the defendant and three others

(the rest were prosecuted under juvenile laws) and after each had demanded separate trials the first information was dismissed and a second information filed against the defendant alone. After trial the jury found the defendant guilty as charged. The defendant moved for acquittal at the conclusion of the state's case and upon denial of that motion did not testify or submit any evidence upon his own behalf.

Eleven of the defendant's specifications of error are concerned with the contention that there was a failure of proof of material allegations of the information and of essential elements of the crime. It was alleged by the state that the defendant was "shooting towards and in the direction of one Harry Moore with weapons likely to produce grievous bodily harm." It is contended that the state failed to prove that the weapons used were likely to produce grievous bodily harm and connect the defendant up with such weapons.

The deputy sheriff and the detective attached to the sheriff's office testified that they found shotgun shell casings and .22 shells along the county road up which the assailants came. The evidence was that these shells were found at a distance of from 235 to 260 feet from the place where Mr. Moore was concealed behind a tree. Ballistic experts testified as to the force and effect of a shotgun at different distances and these experts testified that at the distance at which the shots were fired about 8 percent of the load of a shotgun would reach the target. That is, out of a normal load of 170 to 190 pellets, about 15 of the pellets would reach the target.

Defendant offered instructions that "whether the defendant was within shooting distance of Harry Moore is an element to be considered by you in determining whether a weapon was likely to produce grievous bodily harm;" that "assault is an unlawful attempt, coupled with a present ability to commit a violent injury upon the person of another;" and that unless the jury find "that the state has proved beyond a reasonable doubt that the defendant shot a weapon in a manner likely to produce grievous bodily harm," the defendant must be acquitted.

These instructions were refused. There was evidence in the record that shotgun pellets had hit the side of the house and some had imbedded themselves in the wood. A door was introduced in evidence in which pellets had imbedded themselves and which bore the marks of other bullets. One of the witnesses counted 24 of such marks. The door was located about 15 feet to the left and 5 feet behind the position originally taken by Mr. Moore. In addition it was unquestioned that the .22 rifles were fired at an effective range. Some of the rifles' bullets penetrated the door and the windows and spent bullets were found inside the house.

It is the defendant's contention that the state must not only prove that the weapon *could* produce grievous bodily harm but that the probability was that it *would* produce grievous bodily harm, since the shotguns were fired at an extreme range there was no such probability and even though some of the loads might have reached the prosecutor and even have injured him, no prosecution would lie for assault under R. C. M. 1947, sec. 94-602, subd. 4. It is further contended that there is no showing that the defendant fired any one of the four guns introduced in evidence or fired any gun other than a popgun or a squirtgun; that there is no connection between the defendant and the guns actually introduced; and that therefore an essential item of proof is missing.

Here there is no question that a group of boys came to Mr. ▇ Moore's farm, threw rocks at his house, returned later and fired upon the house with shotguns and .22 rifles. Admittedly the defendant was one of the party that came to the house and participated in the barrage. He said he fired a gun. Whether the shotguns were fired at extreme range or not, some of the pellets of the shotgun load hit the house with force sufficient to imbed themselves in the wood. And Mr. Moore was put in fear—he was asked: "Q. Mr. Moore, at the time of this shooting tell the jury whether or not you were frigthened. A. Frightened? After I got in the house I could not sit still alone. I was plumb exhausted and scared to death." Nor can there be any

doubt that the weapons used were deadly weapons. Whether or not a shotgun or a rifle fired at such a range that it would be impossible to inflict an injury would be an assault with a deadly weapon is not necessary to be determined here. See 4 Am. Jur., Assault & Battery, sec. 17, p. 137. Here the range was such that there was a possibility of injury and a capability of injuring a person struck either by the load of the shotgun or by the projectiles of the .22. Under such cricumstances shotguns and rifles used as firearms are deadly weapons *per se*. 6 C. J. S., Assault & Battery, sec. 77, p. 935. The use of such deadly or dangerous weapons infers an intent to injure so that no specific intent need be shown. 6 C. J. S., Assault & Battery, sec. 77, p. 932.

The shotguns and the .22 rifles named in the indictment were introduced into evidence. They were identified by ballistic experts and were connected with the crime by expert testimony of members of the F. B. I. who testified that cartridges and shells found along the county road from which the shots were fired had been fired from the guns so introduced. The guns were found in the possession of one of the boys who participated in the shooting. The connection between the crime charged and the weapons was sufficient to warrant their admission in evidence under the rule laid down in State v. Allison, 122 Mont. 120, 199 Pac. (2d) 279, and cases therein cited. It is sufficient that the weapons or instruments sought to be introduced are connected *prima facie* with the defendant or his co-actors in the commission of the crime. 22 C. J. S., Criminal Law, sec. 712, p. 1209. See People v. Bundte, 87 Cal. App. (2d) 735, 197 Pac. (2d) 823, explaining and distinguishing People v. McCall, 10 Cal. App. (2d) 503, 52 Pac. (2d) 500, relied upon by the defendant.

The defendant also insists that the state failed to prove the allegation that the defendant shot ''towards and in the direction of Harry Moore.'' The state proved that at the time the shooting started Harry Moore was not in the house at all but had stationed himself 15 feet to the right of the house

which was the target for all of the shots. However, it is no defense that Mr. Moore had moved so that he was not in the line of fire. The evidence showed that there had been a threat to "get" Mr. Moore by someone in the party and the shots were directed into the house where Mr. Moore had been. The case is not analogous to Durham v. Commonwealth, 235 Ky. 366, 31 S. W. (2d) 603, where the only evidence was that shots had been fired and there was no evidence as to whether they had been directed at the prosecuting witness. In that case the court pointed out that under the testimony the gun could have been fired in the air or in the opposite direction and therefore the offense of shooting at the prosecuting witness was not proved.

But in the case at bar the shots were directed at the house and penetrated the windows and door into the room where Mr. Moore was most likely to be. This is like People v. Lee Kong, 95 Cal. 666, 30 Pac. 800, 17 L. R. A. 626, where a police officer had drilled a hole in the roof to attempt to learn whether the defendant was conducting a lottery in the room below. The defendant discovered the hole in the roof and fired his pistol at it. The policeman was not at his station at the time and was uninjured. This was held to be an assault upon the person even though the man who fired the shot was mistaken as to the exact location of his intended victim.

The same is true in the instant case where a threat had been made to "get" Mr. Moore and an attempt was made to carry out the threat by a night-time attack upon Moore's house. The fact that Mr. Moore had moved to a position away from the line of fire and placed himself behind a tree did not prevent the attack from being an assault upon him and sustained the charge that the guns were fired toward him and in his direction. See 1 Wharton, Criminal Law, 12th Ed., sec. 804, p. 1101; 4 Am. Jur., Assault & Battery, sec. 16, p. 136.

Under the Montana statute all participants in a crime are equally liable as principals. R. C. M. 1947, sec. 94-204, says: "All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit

the act constituting the offense, or aid and abet in its commission * * * are principals in any crime so committed.''

And R. C. M. 1947, sec. 94-6423, declares: ''The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must be prosecuted, tried, and punished as principals, and no other facts need be alleged in any indictment or information against such an accessory, than are required in an indictment or information against his principal.''

At common law the actual actor or perpetrator of a crime ▮ was charged as the principal in the first degree and one who was present and aided and abetted in a crime was the principal in the second degree. These distinctions have been eliminated in our Code. Under the sections quoted it is immaterial whether the proof shows that the accused actually was the perpetrator of the offense or whether he aided and abetted. In either case he is a principal and may be tried and convicted as such. It is not necessary that the state prove which of the four guns that were introduced into evidence was fired by the defendant. It is not necessary to show whether he fired any one of the four guns. He was present at the scene of the crime and was admittedly a participant therein. While mere presence at the scene of the crime does not involve a complicity in the crime, in addition to the defendant's mere presence there was evidence that he was a member of the party that first came to the house; that he went with the party to obtain the weapons and returned and fired a gun in concert with the other assailants.

The defendant cites conspiracy cases to show that the state has not carried out its burden of proof. Conspiracy is a distinct crime under Montana statutes. See R. C. M. 1947, sec. 94-1101. But defendant was not charged with conspiracy and those special cases dealing with that crime are not in point.

Lastly the defendant complains that the case was permitted

to go to the jury upon circumstantial evidence, buttressed only by his admission that he was present and fired a gun. Here the evidence is more than circumstantial. As narrated above, these facts made a *prima facie* case to go to the jury and sustain the jury's verdict.

Finding no reversible error the judgment is affirmed.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES BOTTOMLY and ANGSTMAN, concur.

MR. JUSTICE FREEBOURN: (dissenting).

I dissent because the conviction of defendant rests upon exceedingly slight evidence. A nickname called in the dark; a policeman's statement that defendant was known by such nickname; and the same policeman's statement that defendant made oral admissions to him. This is all the evidence that connects defendant with the crime charged.

The law requires more and stronger evidence than this before defendant's conviction should be affirmed. The guarantees of our constitutions of a fair trial require more and stronger evidence than this to sustain a conviction.

The evidence connecting defendant with the crime is not satisfactory evidence, and only satisfactory evidence will justify this conviction.

"The evidence is deemed satisfactory which ordinarily produces moral certainty or conviction in an unprejudiced mind. Such evidence alone will justify a verdict. Evidence less than this is denominated slight evidence." R. C. M. 1947, sec. 93-301-13.

There is no direct evidence that defendant was seen at the place of the crime or participated in it.

State's witness, Margaret Moore, on redirect examination, was asked the leading question:

"Q. Did you identify any one by name? A. Walley.

"Q. Did you know the person or just hear the name? A. Just heard the name.

"Q. You just heard the name 'Walley'? A. Yes."

State's witness, Massey, a police detective, testified as follows: "Q. What did the defendant Calvin Simon say to you at that time? A. In the course of the questioning I asked Calvin if he had been to Laurel. At first he denied it. Then there was some confusion. * * *

"Q. What statement did the defendant Calvin Simon make to you at that time in front of the other person? A. He admitted firing the gun.

"Q. Did he make further statements to you at that time? A. Not at that time.

"Q. Did he make any further statements to you at any further time? A. When the probation officer, Mr. Thomas, came into the room, he admitted in front of him and his parents that he had fired the gun."

Probation officer Albert Thomas did not corroborate Massey. Nor was he asked, while on the stand, if he was present when such statement was made to Massey. Thomas' testimony shows he talked to defendant in the presence of defendant's father and mother and that at no time did he admit to Thomas directly or indirectly, that defendant had fired a gun or participated in or been at the scene of the crime.

Then the leading question was put to Massey: "Q. Did he, at the time he made this statement you have alluded to, state to you he had been to the Moore farm out at Laurel?"

An objection being sustained, he was asked: "Q. Did the defendant Calvin Simon make a further statement to you at that time? A. Calvin or Walley Simon admitted—"

The voluntary connecting, by the witness, of the defendant to the name "Walley," without being asked or any foundation laid leading up to it, shows the interest of Massey in tying the defendant into the case.

It led the prosecutor to the next question:

"Q. Did you at any time hear the defendant Calvin Simon called by any other name than Calvin Simon? A. I did.

"Q. What would that name be? A. Walley.

"Q. You thought that to be a nickname so far as you were concerned? A. Yes, so far as I am concerned."

Although the record definitely shows that up until this point Massey had only "asked Calvin if he had been to Laurel. At first he denied it, then there was some confusion * * *," this leading question was asked: "Q. I am not quite sure, detective Massey. Did you state that the defendant Calvin Simon stated to you that he had been out at the Moore farm southeast of Laurel at the time this incident occurred? A. He did."

Massey's cross-examination shows: "A. Through the course of questioning I asked Calvin Simon if he had fired a gun at the Moore home. He said 'No.' My next question was, 'Did you fire a gun in the direction of the Moore home?' and he said 'Yes.' Q. And that was the question and answer? A. Yes."

He admitted he had not asked defendant where he stood when he allegedly fired the gun or that he asked whether a rifle or shotgun was fired, although this was an investigation into the crime.

Strangely enough, although a written record was made of the oral examination of another suspect no written record was made of defendant's examination.

"Q. Now, you say there was no written statement made— was there any record made—A. No, sir not to my knowledge.

"Q.—of that conversation, sir? A. Not to my knowledge. * * *

"Q. Did you at the time you interviewed the defendant Wiesner make a record? A. I did."

Massey testified further: "Q. Now, did you state that the defendant Simon told you that he fired a shot in the direction of the Moore home? A. That is what he told me. He denied firing at the Moore home. He said he fired at the direction—

"Q. I want you to tell me if at that time and place with those persons present, the defendant Simon denied firing at the Moore home and told you he had shot in the air. A. He did not talk of shooting in the air.

"Q. What did you reply to the defendant Simon when he

told you that he had not fired at the Moore home? A. I probably told him I did not believe it.

"Q. Yes, you may have told him that. But what did you tell him?—You can answer. A. I cannot remember if—."

If probation officer Thomas had been present, as Massey said, and heard defendant admit firing a gun, the prosecution would have brought such fact out in Thomas's testimony. Since this fact was not touched upon or some explanation given as to why Thomas did not corroborate and bear out Massey's statement, we can only assume, giving defendant the benefit of every doubt as the law directs, that had Thomas been asked if, in the presence of Massey, he had heard defendant admit firing a gun, Thomas's answer would have been a denial, thus directly contradicting and impeaching Massey.

Defendant's conviction is based almost entirely on oral admissions Massey alleges defendant made.

Oral admissions are slight evidence and should be viewed with distrust. If probation officer Thomas's failure to corroborate Massey's statement that defendant admitted firing a gun means that such statement of Massey is false, then he is to be distrusted in other facts of his testimony.

The evidence indicates Massey was an interested witness. This being true, and the prosecution failing to produce testimony by Thomas, showing the alleged admission by defendant and which would have been stronger and more satisfactory evidence than that of Massey alone, the evidence offered should be viewed with distrust.

This is the law and well applies in the present case where no written record was made of defendant's oral examination, although it was apparently the practice to make such records and such record in fact was made of the examination of another suspect.

R. C. M. 1947, sec. 93-2001-1, in part provides: "3. That a witness false in one part of his testimony is to be distrusted in others;

"4. That the testimony of an accomplice ought to be viewed

with distrust, and the evidence of the oral admissions of a party with caution * * *.

"6. That evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce, and of the other to contradict; and therefore,

"7. That if weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

Chief Justice Brantly, in Escallier v. Great Northern Ry. Co., 46 Mont. 238, 127 Pac. 458, 461, speaking for this court, said:

"Speaking generally, this character of evidence is the weakest and least satisfactory of any in persuasive value. 'With respect to all verbal admissions, it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness by unintentionally altering a few of the expressions really used gives an effect to the statement completely at variance with what the party actually did say.' 1 Greenleaf on Evidence, (16th Ed.,) sec. 200. The weakness of this character of evidence is recognized by the statute, and it is thereby made the duty of a trial court on all proper occasions to instruct the jury that it is to be viewed with caution. Rev. Codes [1907], sec. 8028; McCrimmon v. Murray, 43 Mont. 457, 117 Pac. 73. It is a quality which attaches to all oral testimony as to declarations or admissions which are relevant to the issues on trial, and are competent because they are against the interest of the party making them or fall within some other rule of admissibility. Though the witness who testifies to the oral statement may be honest, his memory may be at fault, or he may have failed to comprehend and interpret the statement as it was intended to be under-

stood by the speaker. In case it was involuntary, as here, he may not recall the words used, and in endeavoring to relate what he heard give the statement a meaning which the words actually used did not import. Moreover, so easy is it to fabricate such evidence that there is strong temptation to a dishonest, interested witness to do so. 17 Cyc. 806, and notes. * * * the author of the article in Cyc. on this subject * * * then proceeds to enumerate the circumstances which have been noticed by the courts as tending to impair the credibility of such testimony. Among these are the following: '* * * that better and available evidence to prove the fact admitted in the alleged statement is not produced; * * * that other persons present when the alleged statement was made are not produced nor their absence accounted for; that witnesses testifying to the statement are interested parties or otherwise biased; * * * that the memory of the witness is in a confused condition; * * * that discrepancies in the examination of the witness in chief and his cross-examination, although immaterial, betray inaccuracy or confusion of memory; that the witness' testimony, is loose, uncertain, and contradictory; * * *.'

"These observations are pertinent here."

In passing it may be well to point out that witness Massey when asked, at the beginning of his direct testimony: "Q. Who were present at the time you talked with defendant Calvin Simon?" answered: "Deputy Sheriff Hartley and Mr. and Mrs. Simon." He also named another boy as being present.

We can understand why the defendant's mother and father were not called as state's witnesses, and why the boy, also a suspect was not called, to testify to the alleged admissions of defendant.

However, Deputy Sheriff Hartley was called. But search his testimony as you will, and although he says he was present "when the defendant Calvin Simon was interrogated by Albert Thomas, the probation officer, and Detective Massey of the police department," you will not find Deputy Sheriff Hartley making any statement to the effect that defendant admitted

232

being at the Moore farm or having fired a gun. In fact he said: "I did not hear Massey ask Simon any question." Then, too, stronger evidence that defendant was known as Walley could have been produced by calling defendant's school mates and the like.

Defendant's conviction resting as it does on Massey's testimony, so easy of corroboration if true, but not corroborated, should not be upheld.