THE HON. WILLIAM L. HOLLOWAY,  
THE HON. ALBERT J. GALEN,  
THE HON. ALBERT P. STARK,  
THE HON. JOHN A. MATTHEWS,  
⎱ Associate Justices.

STATE, RESPONDENT, *v.* KACAR, APPELLANT.

(No. 5,750.)

(Submitted September 16, 1925. Decided October 6, 1925.)

[240 Pac. 365.]

*Criminal Law—Homicide—Dying Declarations—Admissibility in Evidence—Preliminary Inquiry—Excusing Jury—Discretion—Order of Proof—Information—Leave to File—Procedure.*

Criminal Law—Information—Leave to File—Motion to Quash—Proper Refusal.

1. Where a deputy county attorney appeared in open court and orally moved for leave to file an information presenting at the same time a written request signed by the county attorney which was filed immediately upon granting of the request, the court properly overruled defendant's motion to quash the information based upon the ground that leave to file had been granted on oral request, contrary to section 11624, Revised Codes of 1921.

Same—Information—Motion for Leave to File—What Sufficient.

2. A motion by the county attorney for leave to file an information need not set forth with technical accuracy the facts consti-

(269)

tuting a formal charge, nor, since the statements made therein are made under his official oath, is it necessary that the motion be accompanied by an affidavit.

Same—Appeal—Rules of Supreme Court—When Court will Excuse Infraction.
3.  While willful or negligent disobedience of the rules of the supreme court in the preparation of the transcript and brief may result in refusal to consider either, and ignorance will not generally serve as an excuse for their infraction, they are designed, *inter alia*, to promote, not to hinder or impede, justice, and may be relaxed in a criminal case where it is apparent that error prejudicial to defendant was committed and counsel appointed to defend him were inexperienced in appellate procedure.

Same—Dying Declaration—Admissibility in Evidence.
4.  The statement made by decedent the day before his death, upon being questioned by the witness whether he (decedent) thought he would live, that he was going to die from the wound inflicted and that he was shot by his wife, *held* admissible as his dying declaration.

Same—Dying Declaration—Admissibility—Preliminary Inquiry—Excusing Jury—Discretion.
5.  The trial court may in its discretion excuse the jury during the preliminary inquiry as to the admissibility of an alleged dying declaration, and if it does so and the declaration is admitted, the entire matter covered by the preliminary inquiry must be again canvassed in the presence of the jury, which must then pass upon its weight and credibility.

Same—Dying Declaration—Order of Proof.
6.  Failure of the defendant to offer testimony in contradiction of a witness deposing to a dying declaration at the time when its admissibility was under consideration and before its admission, as she might have done, did not deprive her of the right to offer it in her case in chief.

Same—Dying Declaration—Open to Impeachment.
7.  A dying declaration is open to impeachment in any of the modes by which the testimony of the declarant could have been impeached had he been alive and testifying under oath, and the witness who testifies to such a declaration as having been made to him may be impeached in like manner; hence defendant charged with the murder of declarant was improperly precluded from showing that the deposing witness was not at the hospital where decedent died at the time at which the alleged declaration was said to have been made.

---

4.  What admissible as dying declaration and in what cases, see note in 86 Am. St. Rep. 637. See, also, 1 R. C. L. 539.
7.  Admissibility of contradictory statements by declarant to impeach dying declarations, see notes in 7 Ann. Cas. 885; 20 Ann. Cas. 887; 56 L. R. A. 441; 37 L. R. A. (n. s.) 252.
Impeaching or discrediting dying declarations, see note in 16 A. L..R. 411. See, also, 1 R. C. L. 548.

[74 Mont. 269.]

Same—Failure to Give Instructions—When Appellant may not Complain.
8.  In a prosecution for murder appellant may not complain of the failure of the trial court to give an instruction defining murder of the second degree and concerning dying declarations, in the absence of an offer of a proper instruction upon the subjects.

Courts, 15 **C. J.,** sec. 288, p. 909, n. 7, 8; sec. 292, p. 912, n. 39.

Criminal Law, 16 **C. J.,** sec. 2149, p. 850, n. 51; sec. 2286, p. 926, n. 62; sec. 2290, p. 929, n. 86; 17 **C. J.,** sec. 3440, p. 158, n. 4; sec. 3492, p. 187, n. 32; sec. 3497, p. 188, n. 66 New; sec. 3679, p. 334, n. 4; sec. 3581, p. 240, n. 33; sec. 3582, p. 242, n. 49.

Homicide, 30 **C. J.,** sec. 498, p. 257, n. 35; sec. 503, p. 262, n. 13; sec. 506, p. 267, n. 68; sec. 506, p. 268, n. 70, 76; sec. 507, p. 268, n. 78; p. 270, n. 84; sec. 513, p. 276, n. 70; sec. 522, p. 281, n. 49; p. 282, n. 75 New.

Indictments and Information, 31 **C. J.,** sec. 133, p. 627, n. 81, n. 81 New.

Witnesses, 40 **Cyc.,** p. 2765, n. 19.

*Appeal from District Court, Silver Bow County; J. J. Lynch, Judge.*

ANNA KACAR was convicted of murder in the second degree and appeals from the judgment. Reversed and . remanded, with directions to grant defendant new trial.

*Mr. M. S. Galasso,* for Appellant, submitted an original and a reply brief.

The deceased was alleged to have made pretended dying statements, "She done it." "My wife Anna done it." The question before this court now is whether a deceased person may testify through the mouth of a living witness with regard to his conclusions. "A witness can testify to those facts only which he knows of his own knowledge: That is, which are derived from his own perceptions, except in those few express cases in which his opinions or inferences, or the declarations of others are admissible." (Sec. 10506, Rev. Codes 1921.) In this case the deceased was shot at a place in the head which made it physically impossible for him to have perceived who fired the shot by the aid of his senses. The statements introduced in evidence are statements of facts and statements of conclusions or opinions, depending upon the

question whether the court may indulge in the presumption that the deceased had opportunity to perceive who shot him. But when it is shown that the deceased had no such opportunity to perceive by the aid of his senses who shot him, the said statements are his conclusions and should not have been permitted to go in the evidence over the objection of defendant. (*Jones* v. *State,* 79 Miss. 309, 30 South. 759; *Green* v. *Commonwealth* (Ky.), 18 S. W. 515; *House* v. *State,* 94 Miss. 107, 48 South. 3; *Hollywood* v. *State,* 19 Wyo. 493, 120 Pac. 471, 475; *Commonwealth* v. *Griffith,* 149 Ky. 405, 149 S. W. 825; 3 Wigmore on Evidence, p. 177; 10 Am. & Eng. Ency. of Law, p. 378.)

We further contend that defendant had the right to contradict that the alleged dying statements were made under a sense of impending death and this issue should have been submitted to the jury. (*People* v. *Amoya,* 134 Cal. 531, 66 Pac. 794; *People* v. *Thomson,* 145 Cal. 717, 79 Pac. 435; 2 Michie on Homicide, p. 1097; 2 Jones on Evidence, p. 774; *Jackson* v. *State,* 56 Ga. 235; *People* v. *Rulia Singh,* 182 Cal. 457, 188 Pac. 987.)

*Mr. L. A. Foot,* Attorney General, *Mr. T. E. Downey, Mr. J. F. Sullivan* and *Mr. N. A. Rotering,* for the State, submitted a brief; *Mr. Rotering* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

The defendant was convicted of murder in the second degree. Motion for a new trial was denied. Three notices of appeal appear; by the first she sought to appeal from the judgment and from the order denying her a new trial; by the other two she appealed from the judgment alone. By reason of mistakes appearing in the first notice, and as the result will not be affected, it may be considered that the attempted appeal from the order was abandoned, and that the appeal, perfected by one of the other notices, is from the judgment alone.

The judgment-roll brings up two bills of exception—one relating to the action of the court in refusing to set aside the information upon defendant's motion, the other purporting to incorporate the testimony taken and proceedings had during the trial. Counsel for the state have moved to strike from the record both these bills on the ground that the transcript fails to show that the drafts of the bills were presented to the judge for settlement upon notice of at least two days to the adverse party—the county attorney—pursuant to section 12044, Revised Codes of 1921. The motion is denied. As to the first bill the judge certifies that he settled and allowed the same "after due and sufficient notice to plaintiff." As to the second the record, as supplemented, shows a proper notice was given the county attorney advising him that the bill would be presented to the judge for settlement on April 7, 1925, at 2 P. M.; and the minutes show that on April 7, the county attorney and counsel for defendant stipulated in open court that "the settlement of the bill of exceptions of the defendant herein be continued from this day to Saturday, April 11, 1925, at 10 A. M.," and the court made an order accordingly; further, that on April 11, upon application of the chief deputy county attorney, "the settlement of the bill of exceptions herein is by the court ordered continued until Tuesday, April 14, 1925, at 10 o'clock A. M."; the bill was allowed and settled on April 14. In view of the .facts the motion to strike these bills of exceptions, especially the last one, smacks loudly of trifling with this court.

1. The defendant's first assignment of error, based upon the [1, 2] first bill of exceptions, is that "the court erred in overruling defendant's motion to quash, dismiss, and set aside the information." To sustain this it is urged that leave to file the information was granted upon an oral request of the county attorney, in disregard of the provisions of section 11624, Revised Codes of 1921, which provides: "Application for leave to file an information before an examination, com-

mitment, or admission to bail must be made to the court on written motion by the county attorney." The record does not bear out counsel's contention.

A hearing was had upon defendant's motion, at which testimony was taken from which it appeared: That the defendant was not given a preliminary hearing before a magistrate, that a deputy county attorney appeared in open court and orally requested leave to file an information against the defendant, presenting a written request for such leave, signed by the county attorney, which was granted, following which the information was filed immediately. In the written request the county attorney represented to the court, among other things, that the defendant had been arrested, accused of the crime of murder alleged to have been committed in Silver Bow county, and that he had conversed with the witnesses on behalf of the state with reference to the accusation and from his investigation he was satisfied "that the defendant is guilty as charged." The court deemed the written request sufficient and we think it exercised its discretion properly in so doing. The county attorney was not required to support his written motion with an affidavit nor was it necessary that he set forth therein with technical accuracy the facts constituting a formal charge. The statements made by him were under his official oath. (*State* v. *Shafer*, 26 Mont. 11, 66 Pac. 463; *State* v. *Martin*, 29 Mont. 273, 74 Pac. 725.) The statutes were complied with substantially. (Secs. 11624, 11625, 11626, Rev. Codes 1921; *State* **v.** *Vuckovich*, 61 Mont. 480, 203 Pac. 491.)

2. We now come to the main record on appeal. It contains [3] a great deal of useless matter; sixty pages are consumed by the proceedings incident to impaneling the jury and yet no complaint whatever is lodged concerning the jury; the instructions given and refused are inserted twice; and there are other ·duplications. Other infractions of this court's rules respecting the preparation of a transcript appear.

In the preparation of appellant's brief the rules have been disregarded. The assignments of error are faulty to a degree. A sample: "The court erred in refusing to the defendant the right to introduce evidence to contradict the question whether dying declarations were made in the article of death." This odd statement is not followed by a compliance with subdivision b of Rule X which prescribes in part: "When the error alleged is to the admission or to the rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected."

Ordinarily we should feel warranted in refusing to consider the case further, but the record discloses an unusual situation. The defendant, accused of murder in the first degree, was not represented by counsel of her own choice. Being indigent she was unable to employ counsel. The court appointed two young attorneys to defend her. They are to be commended for their earnestness and zeal. One of them, without compensation, has prosecuted this appeal. Transcript and brief disclose the struggles of counsel unskilled in the use of English, and unfamiliar with appellate procedure. While the brief is deficient in respect of assignments of error, our attention is challenged by arguments therein, which, if sustained by the record, show the defendant entitled to a new trial. Examining the record we perceive that error was in fact committed to defendant's prejudice. In view of this situation we are confronted with the question: Shall this court, in view of what appears upon the face of the record, deny this defendant relief simply because its rules have not been complied with? The rules of this court are designed to promote, not to hinder nor impede, justice. They are designed to regulate the business of the court, to confine the issues within proper limitations, to center the minds of court and counsel upon the essential points in controversy, to expedite the disposition of cases, to the end that justice may be rightly dispensed without delay.

Willful or negligent disobedience of the rules may cause the court to refuse to consider a transcript or brief, or parts of either, and that penalty has been invoked on many occasions. Neither is it to be understood that mere ignorance is to serve as an excuse for their infraction. Reasonable requirements only are prescribed and with these every lawyer who practices before this court should be conversant. The rules, as was observed by Mr. Chief Justice Brantly in *State ex rel. Nissler* v. *Donlan,* 32 Mont. 256, 80 Pac. 244, "have the force of statutes within the limitations of their application, * * * and should be enforced, except when the court, for good cause shown, in a particular case, may relax them in order that justice may be done. (*State ex rel. King* v. *District Court,* 25 Mont. 202, 64 Pac. 352; *Montana Ore P. Co.* v. *B. & M. etc. Min. Co.,* 27 Mont. 288, 70 Pac. 1114; *Martin* v. *De Loge,* 15 Mont. 343, 39 Pac. 312.)"

Indubitably good cause appears in this case and we shall now proceed to its disposition upon the merits. Other courts under peculiar circumstances have pursued a similar course. (*State* v. *Jones,* 12 Mo. App. 93; *Sharp* v. *Mayor,* 31 Barb. (N. Y.), 578.)

3. Before proceeding further, it may as well be said that the trial of the case was attended with much confusion which the judge patiently sought to prevent. Numberless objections were interposed, generally of a technical character, seldom with merit. By constant and inopportune objections witnesses were confounded and testified with much difficulty, both upon direct as well as cross-examination. The error into which the court fell probably may be ascribed to this confusion as well as to the contentions of counsel.

Juro Kacar, the deceased, was wounded on October 20, 1924, and shortly thereafter taken to St. James Hospital. The wound was described by a surgeon as one caused by a bullet which entered on the left side of the neck at a point midway between the mastoid and the collar-bone, ranged upward,

egressing on the right side of the face at a point midway between the outer angle of the eye and ear. When the attending physician first examined the patient he pronounced the wound mortal, but Kacar made such remarkable progress toward recovery that the physican was so far encouraged that he told friends of the wounded man that he would recover. Seemingly, according to the physician's testimony, the patient progressed favorably until approximately 9 o'clock on the evening of October 29; shortly after that time another attending physician entered the bedroom of the patient, finding him upon the floor near his bed, in the throes of a hemorrhage as a result of which he died within half an hour; the hemorrhage was the result of the wound.

No witness (except possibly the defendant) saw the shot fired. It may be said that the state's case (the *corpus delicti* having been proved) rests upon the testimony of three witnesses, Mrs. McLaughlin, Mrs. Connors and Dan Komad.

Kacar and his wife Anna, the defendant, lived in the second story of a flat on East Park Street in the city of Butte. Downstairs, in separate apartments, lived Mrs. McLaughlin and Mrs. Connors, who shortly after noon on October 20, 1924, were in the rear of their apartments engaged in washing. At this time Kacar appeared, blood streaming from his wounds. As he reached Mrs. McLaughlin's door, Mrs. Kacar, the defendant, was a short distance behind him, and she was eight or ten feet from Mrs. McLaughlin. Mrs. Connors was near by. According to Mrs. McLaughlin's testimony, she asked Kacar who did it; he, pointing to his wife, replied that she did it. Then Mrs. McLaughlin asked Mrs. Kacar who did it and Mrs. Kacar said she did not know.

This is from Mrs. Connors' testimony: "Q. While you and Mrs. McLaughlin and Juro Kacar and Mrs. Kacar were there, did Mrs. Kacar say anything? A. She told us not to believe him and not to listen to him, and not to give him a drink of water. Q. And what, if anything, did Juro Kacar

say while Mrs. Kacar was there? A. Well he turned and
pointed to her and he said, 'She done it.' Q. Did she say
anything then? A. No, sir; she didn't.''

Dan Komad testified that he was an old friend and fraternity
[4] brother of Kacar. He said he visited the sick man at
the hospital every night, beginning on the 20th of October,
until and including the twenty-eighth day of October. On
the 28th, the day before Kacar died, Komad testified: ''I
asked him if he think he is going to pull through and live,
and he said, 'No.' * . * * He told me that he is going to
die from the wound of the bullet, * * * and that he got
a hard breath in his chest. ''Q. And did he tell you who
had injured him or shot him? A. He did. * * * His
wife. * * * Well, he told me that he was shot by his
wife. * * * He told me that he was shot by his wife
Anna. * * * He said she was standing in the back of
him in his home when the shot was fired.'' This testimony
was admitted over defendant's objections but, the circum-
stances considered, unquestionably it was admissible as
Kacar's dying statement. (*State* v. *Russell*, 13 Mont. 164,
32 Pac. 854; *State* v. *Byrd*, 41 Mont. 585, 111 Pac. 407;
*State* v. *Crean*, 43 Mont. 47, Ann. Cas. 1912C, 425, 114 Pac.
603.)

It is true that upon cross-examination this testimony was
obscured; but the weight of evidence is for the jury and the
jury may have believed, taking Komad's testimony in its
entirety, that Kacar on the 28th did say that he expected
to die and then told Komad that the defendant had shot him.
Komad testified that on the 28th of October he was with
Kacar about an hour; no one else was present; he was there
from about 7:30 to 8:30.

At all times after her arrest and upon the trial the de-
fendant denied strenuously that she fired the shot; a discussion
of her testimony will not prove useful to this inquiry.

After defendant had testified, her counsel offered testi-
mony in an attempt to contradict the evidence of Komad

with respect to the dying declaration. This was a matter of the utmost importance to the defendant. The evidence of Komad may have been that upon which the jury found defendant guilty. Without it the evidence of the witnesses McLaughlin and Connors, which did not throw any light on the circumstances surrounding the shooting, might have seemed to the jury insufficient to warrant a conviction.

When the state first broached the subject of a dying declaration the defendant moved that the inquiry respecting its [5] admissibility be made in the absence of the jury. The court denied the motion saying: "All the evidence must be in the presence of the jury." The court did not err in its ruling. Abstractly, the statement is correct. Nevertheless the court in its discretion might have excused the jury during the preliminary inquiry. That "was a matter entirely within the sound discretion of the trial court, and, in the absence of any showing of abuse of that discretion, the ruling will be affirmed. (5 Wigmore on Evidence, p. 137; 21 Cyc. 985.)" (*State* v. *Crean, supra;* and see 1 R. C. L. 544.) Pursuant to good practice the court frequently finds it advantageous to hold the preliminary investigation in the absence of the jury. Testimony being offered the court must decide upon its admissibility; if the offer be denied the proffered testimony may be preserved in the record by an appropriate offer of proof (preferably in writing). Thus highly damaging statements may be kept from the ears of the jury—statements which are likely to influence minds untrained in legal proceedings despite admonitions and instructions of the court to disregard that which it has decided to reject. If the court decides favorably upon its admissibility then the entire matter covered by the preliminary inquiry must be gone over in the presence of the jury just as though the inquiry had not been made; for the jury, while it has nothing to do with the admissibility of the evidence, must pass upon its weight and

credibility. (*State* v. *Sherman*, 35 Mont. 512, 119 Am. St.
Rep. 869, 90 Pac. 981; *State* v. *Byrd, supra.*)

The court was of the opinion that the testimony in contra-
[6] diction of Komad should have been offered when the ad-
missibility of the dying declaration was under consideration,
and before its admission. It is true that counsel for defendant
might with propriety have offered the testimony when the
court was considering the admissibility of the dying declara-
tion. (*State* v. *Berberick*, 38 Mont. 423, 16 Ann. Cas. 1077,
100 Pac. 209.) In the *Berberick Case*, when the court was
considering the admissibility of a confession, defendant offered
to prove that when he made the alleged confession he was of
unsound mind. The court rejected the offer and this was held
to be error. The testimony was admitted as a part of de-
fendant's case, but this did not cure the error—the confession
was in evidence. In the instant case the defendant did not
offer the testimony until her case in chief was reached. That
which was competent should not then have been excluded.
(*Hunnicutt* v. *State*, 20 Tex. App. 632; *State* v. *Elliott*, 45
Iowa, 486.) In the *Sherman* and *Berberick Cases* the court
called attention to the provisions of section 3441, Code of Civil
Procedure of 1895, now section 10699, Revised Codes of 1921,
which provides that "all questions of law, including the ad-
missibility of testimony, the facts preliminary to such admis-
sion, and the construction of statutes and other writings,
and other rules of evidence, are to be decided by the court,
and all discussions of law addressed to it." Both cases, of
course, recognize the rule that the weight and credibility of
the evidence are questions for the jury solely. The question
of the admissibility of the testimony is one of law, frequently
depending upon the facts. The preliminary facts to be con-
sidered are such only as relate to whether the testimony shall
be admitted or rejected, and the court's decision upon them
will not be disturbed unless it is clearly in conflict with the
weight of the evidence upon the point. The only question the

court considers is whether the testimony upon the facts pre-
sented is entitled to admission. Preliminary proof touching
the admissibility of a dying declaration and of the circum-
stances under which it is alleged to have been made, is to be
shown to the court, which is the exclusive judge of its
admissibility, in the same manner as the preliminary proof
of documents and the competency of witnesses, is always
addressed to the court. (1 Greenleaf on Evidence, secs. 156,
160; *Lambeth* v. *State*, 23 Miss. 322.) If the declaration be
admitted the jury may believe or disbelieve all or any part
of it.

Where the duty of passing upon the weight and credibility
of the evidence is entrusted to the jury solely it would be
fallacious to hold that simply because the court as a matter
of law had decided the testimony is entitled to admission as evi-
dence, it may not be contradicted or impeached. Nothing to
the contrary of what is here said was intended in the court's
language which appears on page 442 of the *Berberick Case.*

The dying declaration of a person is simply a part of the
[7] evidence. It is subject to discredit and impeachment by
any competent testimony which impairs its value. (1 R. C. L.
548.) The declarant himself may be impeached, as may the
witness who assumes to repeat what the declarant is alleged
to have said. The declarant may have been unworthy of
belief and his hearer of unassailing veracity, or the declarant
may have been truthful and his hearer may falsify or distort
his language. (Note to *Liddell* v. *Stats,* 16 A. L. R. 411.)
And a witness may fabricate a dying declaration altogether.
So it is said that dying declarations are open to impeachment
in any of the modes by which the testimony of the declarant
could have been impeached had he been alive and testifying
under oath. (30 C. J. 280; 3 Wigmore on Evidence, sec. 1446;
*Couch* v. *State,* 93 Tex. Cr. 27, 25 A. L. R. 1359, 245 S. W.
692.) And manifestly the witness who testifies may be
impeached just as any other witness may be impeached. (Secs.

10508, 10668, 10669, Rev. Codes 1921.) Clearly a defendant may show, if he can, that the purported declaration is false wholly or in part.

A witness for the defense, Milie Kaich by name, testified to a long and intimate acquaintance with Kacar. He said he was boarding with the Kacars at the time of the tragedy. He also knew Dan Komad. The witness said he visited Kacar at the hospital every day the latter was there with the exception of one day possibly; was positive that he visited him on the 28th of October. On that evening he was with Kacar an hour, from 8 to 9 o'clock. With reference to Komad, Kaich was asked: "Did you see that man on the 28th of October, the day before Mr. Kacar died, at any time down at St. James Hospital, in there to see Mr. Kacar?" The question was "objected to as incompetent, irrelevant and immaterial; calling for a conclusion of the witness, and not proving or tending to prove any defense in this action." To which counsel for the defense interjected: "They put a witness on to prove the dying declaration. That witness was never there." The court ruled that the proof should have been offered before the alleged dying declaration was admitted in evidence, and sustained the objection. Counsel for the defendant then offered to prove by the witness that Komad was not at St. James Hospital, Butte, Silver Bow county, Montana, at any time between 8 and 9 P. M. on October 28. The state's objection was sustained. This was error. The testimony should have been admitted; it tended to impeach Komad and thus the integrity of the dying declaration. By this ruling the court in effect foreclosed all inquiry along this line.

Other offers of proof were made while Kaich was still a witness and later when another witness was upon the stand; but the offers were phrased so defectively that we think the court was justified in refusing them. The substance of these we need not now consider. If offered again in proper form

the court, aided by what is said in this opinion, will be enabled to resolve the questions presented correctly.

The defendant complains because the court did not give to [8] the jury an instruction defining murder of the second degree. But as she did not offer a proper instruction on that subject, and did not object to the instructions given defining murder, she may not now complain. The same may be said as to the complaint that the court did not advise the jury concerning dying declarations. The court certainly did not err in refusing offered instructions No. 30A.

The judgment is reversed and the district court of Silver Bow county is directed to grant the defendant a new trial.

*Reversed and remanded.*

ASSOCIATE JUSTICES HOLLOWAY, GALEN, STARK and MATTHEWS concur.