STATE OF MONTANA, Plaintiff and Respondent, *v.* FLOYD C. LONDON, Defendant and Appellant.

No. 9721.

Submitted March 6, 1957. Decided April 9, 1957.

As Amended on Denial of Rehearing May 10, 1957.

310 Pac. (2d) 571.

412

Messrs. Longan & Jones, Billings, Mr. Raymond Hildebrand, Glendive, for appellant.

Mr. Arnold H. Olsen, former Atty. Gen., Mr. Forrest H. Anderson, Atty. Gen., Mr. William F. Crowley, Asst. Atty. Gen., Mr. Roland V. Colgrove, Sp. Prosecutor, Miles City, Mr. B. Miles Larson, Co. Atty., Circle, for respondent.

Mr. Franklin S. Longan, Mr. Hildebrand, Mr. Crowley, and Mr. Colgrove argued orally.

MR. CHIEF JUSTICE HARRISON:

This is an appeal by the defendant from a judgment entered upon a verdict of guilty of murder in the second degree.

During the year 1955, and for some years prior thereto, the defendant operated a grain farm in conjunction with his son, Billy, near Circle, Montana. On or about August 6, 1955, they had employed upon the ranch Marvin Byron, Troy Crosley and one Ed Schafer, whose nickname was "Missouri." At this time of the year they were combining and hauling wheat. Clement A. Myzska and Pat Rauen, both of whom resided at Edgar, Wisconsin, and who had been schoolmates in high school came to the vicinity of Circle, Montana, on August 7, 1955, traveling in Rauen's 1947 Chrysler automobile. They went to work for Ace Sutton, and during their employment a rod burned out of the automobile. The car was towed to Circle, but remained unrepaired. The boys worked for Sutton until August 12, 1955. On August 13, Floyd London met them in Circle and employed them to work upon his ranch. As a part of the arrangement for the employment, an agreement was made whereby the car could be repaired at the ranch. Myzska and Rauen went to the London ranch and for the next few days worked in harvesting the crop.

Clement A. Myzska had a .25 automatic pistol. At one time Ed Schafer, Troy Crosley and Floyd London, with Myzska

were returning to the ranch from Circle, when they stopped and fired the pistol several times. It was also fired when they arrived home. On at least one occasion Floyd London had fired the pistol.

Billy London was not on the ranch the night of August 16, but all the others were there. On the morning of August 17, Floyd London sent Marvin Byron, Troy Crosley and Ed Schafer with a GMC truck to a field to put a belt on a combine. London later took Myzska and Rauen to Circle, and when they arrived there the GMC truck was in Circle. Floyd London then told Rauen and Myzska if they located Schafer, Byron and Crosley they could make arrangements to tow the automobile to the ranch. Floyd London then went to the Stockman Bar, and Rauen and Myzska went to look for the other men who were located at the Silver Dollar Bar. They made arrangements to pull the car to the ranch after Byron got a haircut. During the conversation Crosley asked Rauen and Myzska to tell Mr. London that he wanted to draw his money to buy a car. They conveyed the message to Floyd London at the Stockman Bar, but he laughed and said ''Yeah.'' Later they were again requested to tell London that Byron and Crosley wanted their money, and on this occasion London replied that he couldn't give them any money as he did not have their time. It appears from the record that Billy London kept the time, and he was not available at the time of these conversations.

After Byron got his haircut he, Rauen and Myzska located Troy Crosley and Ed Schafer in the Corner Bar. Troy Crosley was drunk, and he and Schafer were engaged in an altercation. They were separated, and while Rauen, Myzska and Byron were taking Crosley out of the bar, he fell and became unconscious. They placed Crosley in the truck, and Rauen returned to the Stockman Bar and told London to bring Schafer to the ranch with him when he returned. They hooked the automobile onto the truck and Rauen, Myzska, Byron and Crosley went to the London ranch. Upon their arrival at the ranch, Crosley was carried into the ranch house and placed on his bunk. Rauen

built a ramp and drove the automobile on it and started to repair the car. This was about 2:30 or 3:00 o'clock in the afternoon.

The defendant testified that while walking on the street he heard some loud talking in the Silver Dollar Bar during the afternoon; that he went in and among the people in the establishment was Schafer; that he had a conversation with him which he related as follows:

"Q. What did he say to you? A. Well he said I have had trouble with Troy, he added that Troy said he was going to get his money or else and Missouri told me I had better watch out for him.

"Q. By Troy who did he mean? A. Troy Crosley.

"Q. Is that who he was referring to? A. Yes.

"Q. Did you stay in the Silver Dollar Bar any appreciable length of time? A. No, not long.

"Q. Were you concerned with what Schafer said? A. No, he was drunk, I didn't have any faith in what he said, it just didn't frighten me, I knew he was drunk or about drunk I would say."

Later in the afternoon London saw Schafer in the Stockman Bar, and his testimony in that respect is as follows:

"Q. Did you see Schafer in the Stockman Bar when you entered it? A. Yes, sir, he came in after a little while, I don't know about what time, he came in and sat down on my left, I believe.

"Q. And did he and you have any conversation? A. Well he just repeated again that Troy was going to shoot me and going to shoot him too.

"Q. Did he say anything about Troy having a weapon? A. Yes, he said Troy had got a gun and he was going to shoot 'Me and you both'.

"Q. What did you reply to that? A. I said nobody is going to shoot me; I remember those are my exact words."

The time of this conversation and succeeding events is placed

at between 4:45 and 6:00 o'clock in the afternoon by the record. The defendant further testified:

"Q. Did anyone else come in? A. Yes.

"Q. Who? A. Billy.

"Q. And did he say anything to Schafer? A. Yes and he said 'a fellow came down to Brockway and told me that one of my men was going to shoot me on sight'.

"Q. You are now quoting the words of Billy, your son? A. Yes, sir.

"Q. He told you someone came all the way from Brockway to inform him one of the members of your crew was going to shoot him on sight? A. Yes, sir.

"Q. Did Schafer say anything? A. Schafer said 'Yes, he's going to shoot you and me too'.

"Q. Now, Mr. London, after that conversation, tell the Court and jury as near as you can remember it what you observed and heard and what Billy did and Schafer did and what you did in the Stockman Bar? A. Well to the best of my knowledge I stayed approximately where I was at the bar and I remember Billy went to the end of the bar, he went down where the gun case was and looked at the guns, you know, and I didn't hear any conversation down there, you know, there were quite a few people in there, I don't know how many. I didn't hear what was said, he came back around to the middle of the bar somewhere and I saw Albert take a gun down and bring it and place it on the bar and then I saw him go and get some shells and bring them down and Billy took the gun and the shells.

"Q. Did you have any conversation with Billy about that time? A. Yes.

"Q. What was it? * * * A. He said I am going out and see what is the matter with the men.

"Q. And what did you say? A. I said I will go along too.

"Q. And what did he say? A. He said 'No Dad, don't go along, you stay here'. I said 'No, I have thirty to fifty thousand bushels of wheat there and I don't know what Troy

or Marvin will do and I am going too'. So Billy went out and as he crossed the street 'Missouri' followed him and I followed 'Missouri' and we got in the pickup."

At the time the gun was purchased by Billy London, Floyd London told Albert Bentz, the bartender who handled the sale, "to make a slip for the gun and the shells."

With regard to his conversation with Floyd London and Billy London in the Stockman Bar, Ed Schafer testified:

"Q. Do you remember whether or not, while you were in the Stockman Bar, whether or not Billy London came in? * * * A. Yes, sir.

"Q. And what does he do when he comes in? A. He asks me, he said, 'Missouri, are you looking for me?' and I said 'No'. He said, 'I understood when I was out at Brockway, that someone was looking for me'. He said that someone down there had told him someone here in Circle was looking for him with a gun.

"Q. After that, what did Billy do, if you know? What did you see him do? A. I see him buy a .30-30 sir.

"Q. After he got the .30-30 did he go anywhere? A. They told me to come on. They said, 'Come on let's go'.

"Q. Who told you that? A. Billy and Floyd both.

"Q. Where was it you went? A. To the ranch."

The defendant in his testimony expressed such concern as he had with regard to the goings-on as follows:

"Q. But you knew as I understand it there was somebody at the ranch that was supposed to be gunning for you? A. I was told that.

"Q. And you had some fear, some apprehension? A. Very little.

"Q. You didn't go out there to see if there was anybody gunning for you? A. I had to go home.

"Q. You didn't go for that purpose, you had no apprehension or anything? A. Very little.

"Q. You had some? A. I had an idea, when a man says he might shoot he might.

"Q. You knew and you had some apprehension at that time? A. Some, yes. * * *

"Q. You remember some talk in the Stockman Bar that someone was gunning for you? A. The talk I remember is what Missouri told.

"Q. I thought Billy told you also. A. Billy told me someone was gunning for him.

"Q. And not for you? A. He didn't mention me. * * *

"Q. The only person as I get it that told you about being gunning for you was Missouri and Billy, is that correct? A. I believe that's right."

As to his reasons for going to the ranch, the defendant explained:

"Q. Now as I understand it, if I heard it clearly, you went out to the ranch and you were going to let these men go. A. I was going to let Troy and Marvin go.

"Q. You determined that after you talked to Billy, is that correct? A. I had my mind made up after Schafer told me what he told them.

"Q. That you were going to let them go at that time? A. I didn't want men around that were shooting.

"Q. At the time you yere talking to Billy, it was at that time, that is when Billy was down here at the Stockman, the time you were talking to Billy, it was at that time you determined that you would let these two fellows go, pay them off and get rid of them? A. No, I determined that before that.

"Q. Now, when had you made up your mind as to that? A. When Schafer was talking to me.

"Q. As I understood it then, if I get it clear, someone had told you that Troy was gunning for you? A. Yes, sir.

"Q. And you then saw Billy buy the gun? A. I saw him receive the gun. I didn't see him buy the gun. .

"Q. Was there one purpose for which he was buying a gun? A. Not necessarily. .

"Q. Now, did you or did you not know the purpose for which he was buying that gun? A. No.

"Q. You didn't? A. No.

"Q. You didn't know or have any idea whether he was arming himself to go out because of conditions? You knew he got the gun, you knew he was going out to the ranch, you knew he already had a gun and you knew about this trouble and yet you didn't have any idea that he was arming himself to protect you and he when you got out there? A. Yes.

"Q. Then you knew the reason he got the gun? A. Not necessarily.

"Q. You knew he anticipated trouble out there? A. When a man is threatened, yes.

"Q. Now, I am asking you. A. Yes.

"Q. You saw Billy get the gun? A. Yes.

"Q. You can't assign any reason for him getting the gun? A. I had nothing to do with it. Nothing whatever.

"Q. Of course, you were fearful of both Troy and Marvin? A. Probably Troy."

The defendant further testified that upon arrival at the ranch:

"A. Billy got out of the pickup and I got out, Schafer got out, I stopped a moment where Pat was and where Marvin was and I said 'You boys stay put, there might be some trouble'. I didn't see Troy and I didn't know what Troy might do, that is exactly what I told him. In the meantime Billy and Missouri went in the house and I followed them."

According to other witnesses, upon the arrival of the Londons and Schafer at the ranch, Byron and Rauen were still working on the car, and Floyd London was the first to get out of the pickup. He approached Rauen and asked, "Are you looking for me?" Pat said he wasn't and Floyd London shoved him and ordered him to "get over and get down." Floyd London then asked Marvin Byron the same question, and Marvin replied that he wasn't looking for them. London then grabbed Byron by the arm, pulled him and tore his shirt. As Marvin went by the pickup, Billy London said, "Marvin, I heard in town there was someone looking for us in town with a gun, was it you?" Marvin again denied any knowledge of this. Billy London also

stated: "We are going to get down to this grumbling that is going on around here, and find the root of it." Rauen and Byron then walked away from the car and both crouched down.

Floyd London, Billy London and Ed Schafer entered the ranch house. Floyd London went to his bedroom, got the .270 rifle from the closet and followed Billy London into the bunk-room, which is entered through a doorway, immediately off the kitchen. As to what then occurred, Troy Crosley testified as follows:

"Q. Did you observe anybody when you woke up? A. Yes sir.

"Q. Who was it? A. Floyd and Billy London. * * *

"Q. Did either one of those gentlemen have anything in their hands? A. Yes sir.

"Q. State what it was? A. Floyd had a gun and Billy had a gun.

"Q. You say Floyd had a gun and Billy had a gun? A. Yes.

"Q. And they were standing approximately in the positions you have placed them in State's Exhibit 10? A. Yes.

"Q. Were those guns pointed at anyone? A. Yes sir, at me.

"Q. At you? A. Yes, sir.

"Q. Can you estimate how far the muzzles were from your body? A. About a foot sir.

"Q. From what part of your body? A. My face.

"Q. Are you still in a reclining position as in Exhibit 10? * * * A. I was lying like that on my bunk.

"Q. When you saw that did you do anything? A. Yes sir, I raised up.

"Q. Now will you raise up the statue. (Witness complies with request). A. I raised up along in here somewhere, I stepped back like that.

"Q. You say you raised off of your bunk? A. Yes.

"Q. And what did Billy do? A. He kind of stepped back, but he still had the gun pointed at me

"Q. What part of your body was it pointed at? A. Along in my middle some place.

"Q. While you were lying down there did you hear one of them say anything to you? A. Yes.

"Q. What was it? A. One said where is that gun, what did you do with it?

"Q. Did they use other language? A. Yes sir.

"Q. What was it? A. You Son-of-a-Bitch where is that gun, what did you do with it?

"Q. Did you get up at that time? A. Yes sir.

"Q. Now you are up there after they said to you what did you do with that gun, then what did you do? A. Shoved Billy's gun back and I told them to get their guns off of me that I would hang it around their neck, I shoved the gun back and Billy said 'Better look out boy or I will shoot you'.

"Q. Did any other conversation take place before the gun was fired? A. That is about all I heard until I heard the boy in the other room.

"Q. While you were standing in that position did you hear a voice? A. Yes sir.

"Q. And what did you do when you heard the voice? A. I kind of turned my head.

"Q. You turned your head toward what? A. Toward this door.

"Q. Did you see anything? A. Yes, I saw Clem walk up.

"Q. Will you place this statuette about where you saw Clem walk up. A. Along in here. (Places statue.)

"Q. Did you see anybody else when you turned your head? A. Yes sir.

"Q. Who did you see? A. I saw Missouri.

"Q. Will you place this statuette as best you can where you saw him? A. He was right next to this boy (indicating).

"Q. Now in that position with your head turned looking through the doorway as you stated did you see Mr. London do anything? * * * A. Yes.

"Q. What did he do? * * * A. Well I heard this boy he called in he said 'What is going on?' I turned and looked

through the door and Mr. London swerves around and shoots this gun from his hip.

"Q. Can you demonstrate with that paper there how he held the gun when he shot? A. Yes sir. * * * (Witness demonstrates with the paper.)

"Q. And it is fired, is that correct? Now what happens to Clem? A. Well his body comes up into the air and he falls back. His body goes up over backwards."

As to these same incidents, the witness, Ed Schafer, testified:

"Q. Who went in the house? A. Floyd and Billy and I.

"Q. Now when you are in the house, all three of you in the house, what did Floyd do? A. He went to the closet.

"Q. Referring to the model here, I will have you turn him around. Now you say he went to the closet? A. Yes sir.

"Q. Will you point on State's Exhibit No. 10 what closet he went to? A. Right here. (Indicating on model).

"Q. After he went there did he come back with anything? A. Yes sir.

"Q. What was it? A. It was a .270.

"Q. Billy likewise has a gun, has he? A. Yes sir.

"Q. Where did they go in the house? A. They go to the bunkroom, sir. * * *

"Q. Did you see anyone in the bunk in there? A. Yes.

"Q. Who? A. Troy.

"Q. State whether or not you saw Floyd and Billy London enter the bunkroom? * * * A. Yes sir.

"Q. Now did they have anything in their hand when they went in there? * * * A. Yes sir.

"Q. What was it? A. It was a .30-30 and a .270.

"Q. Who had the .30-30 rifle. A. Billy London.

"Q. Who had the .270 rifle? A. Floyd London.

"Q. Will you explain, what if anything, they did? A. They walked over to Troy and Billy poked Troy with the .30-30 and Troy—Troy he did lay there. He was pretty drunk when he left town and Floyd had his gun on him at the same time—on

Troy. And I said, 'No, don't', and they kind of pushed me back and shoved me through the door. * * *

"Q. Was anything said while the parties you mentioned were in that position? A. Troy jumped up and said, 'Get the guns off of me', and Clem had run in and said, 'What is going on' and at that instant there was a shot fired.

"Q. What did Mr. London do? A. Floyd London? He turned and fired and shot.

"Q. What happened to the rifle he was holding? A. It went off.

"Q. You say he turned, what direction did he turn? A. In that direction there. (Indicating).

"Q. State whether or not, when he turned, you did see him turn? A. Yes sir.

"Q. You saw the muzzle of the gun go up? A. Yes. * * *

"Q. What did he do in respect to the muzzle of the gun? A. He raised it.

"Q. Then, you say, the gun went off? A. Yes sir.

"Q. Now, can you show us, if you will, what happened to Clem? A. He went up in the air and pitched and fell like that sir. (Indicating)."

At the time of the arrival of the Londons and Schafer at the ranch, Myzska was not in sight. Inquiry was made of Rauen and Byron of his whereabouts, and the Londons were advised that they did not know. After the Londons had entered the house the witness Rauen testified:

"Q. Did you hear any noise. A. Yes there was talking as though they were awakening somebody which I presumed was Troy, then they hollered for Clem, both Mr. London and Billy London hollered for Clem.

"Q. What did they say? A. Come on in Clem, come on Clem and just after they got through talking and hollering, I saw Clem about fifteen feet north of the door. * * *

"Q. Then after Clem goes in, first of all does Clem enter the house? A. He went right into the house."

From the record it is apparent that Floyd London and his

son Billy were aware that it was rumored one of their ranch hands was looking for them with a gun. Billy London armed himself in Circle, Floyd London armed himself at his ranch. They interrogated each of their ranch hands as to whether or not he was the one who was looking for them and finally reached the last man, Clement A. Myzska, known by Floyd London to have a pistol, and they summoned him into the house, and when he came in and said in a loud voice: "What is going on here?", Floyd London turned and shot him.

After the killing all parties went out of the house and later the Londons requested Crosley to go back in and get the pistol that belonged to Myzska which he did. He found the gun in a hand bag which he unzipped and brought the pistol out and gave it to Billy London.

The Londons then decided to go to Circle and report the shooting to the sheriff, and they all went in the pickup. No detailed explanation of the shooting was made to the authorities by the Londons other than to state the shooting was an accident.

No one was arrested at that time and the next day Billy London had Crosley, Byron and Schafer brought to the ranch where each was taken separately into a trailer house and interviewed in the presence of Floyd and Billy London by Floyd London's attorney. At that time, Ed Schafer stated it was merely an accident. He denied then that he had told Floyd London that someone was looking for them with a gun, but when Billy and Floyd London insisted otherwise, he changed his story. At this interview, Crosley stated he was passed out and that he did not see the shooting. Both these witnesses testified in the same manner at the inquest. At the trial they testified that what they had said in the trailer house and at the inquest was untrue and that they did witness the shooting of Myzska. As their reason for not telling the truth they expressed fear of the Londons. Crosley said in explaining this matter, "Well, sir, I seen this boy get shot down, and I came into town. Nobody was arrested, they were loose and walking around and I was not going to get up and testify to something like that."

The appellant has assigned thirty-three specifications of error which we will consider in the order they have been set forth.

The first specification of error contends that the court by refusing to admit appellant to bail before the trial denied him his constitutional right to bail and thereby deprived him of a fair trial.

The defendant in this matter was charged with murder. R.C.M. 1947, section 94-8303, provides:

"A defendant charged with an offense punishable with death cannot be admitted to bail when the proof of his guilt is evident or the presumption thereof great. The finding of an indictment or the filing of an information does not add to the strength of the proof or the presumptions to be drawn therefrom."

The appellant contends that under this section and the holding in State ex rel. Murray v. District Court, 35 Mont. 504, 90 Pac. 513, 514, wherein it is stated that a defendant in a capital case is entitled to bail if, upon the hearing of the application for bail, the county attorney fails to present evidence overcoming the exception contained in the statute. In that case this court said: "On the failure to make such showing, the defendant is entitled to bail in all cases; but, if such showing is made, the court or judge should refuse bail without hesitation."

It would appear to us to require an idle act of a county attorney, if the court is already in possession of facts which would move its discretion, to make a further showing. In this case, the court had already in its possession at the time of its ruling a very complete motion to file the information, the transcripts of the coroner's inquest and the habeas corpus hearing. Since the matter is one within the discretion of the court we should not be inclined to disturb its ruling unless a clear abuse of such discretion appears. It is to be noted in this connection that while the motion for admission to bail appears in the transcript, together with the notice of hearing, no minutes of the court or ruling thereon appears. It is therefore not possible for us to determine what transpired before the court at the time

of the hearing. Counsel state that the motion was denied, and we assume that such was the case.

We can see no manner in which the denial of bail prior to the trial has prejudiced the appellant or in any manner denied him a fair and impartial trial.

The second specification of error assigned by the appellant is that the trial court erred in denying his application for change of place of trial. A petition for this purpose was filed, to which were attached many affidavits and other documents. The state also filed affidavits, appeared in opposition to the motion, and the court took testimony, following which the motion was denied.

The matter of the application for a change of place of trial has been before this court on several occasions. We have consistently held that it is addressed to the sound discretion of the trial court, and that unless a clear abuse of discretion is shown the ruling of the trial court will not be disturbed. State v. Hoffman, 94 Mont. 573, 23 Pac. (2d) 972.

While most of the supporting affidavits set forth mere opinions, a few do contain facts, but we do not believe that the facts as set forth were sufficient, in view of the testimony taken at the time of the hearing, to move the discretion of the court. The fact that an isolated rumor has been heard by certain people, few in number, is hardly a moving cause to grant such a motion.

Counsel have commented on newspaper articles but these are not submitted in any manner in the record so their contents are not available to this court. Bias on the part of the presiding judge was alleged in the motion, based upon the denial of bail and an order, made at the request of the county attorney, for removal of the defendant to the county jail at Sidney. We fail to see how denial of bail could be claimed as bias for such is a mere preliminary manner and has nothing whatever to do with the trial on the merits. As to the order changing the place of confinement, the county attorney informed the court that the jail at Circle was in poor condition, contained no sanitary arrangements in the cells, and was not fit for habitation for any

period of time. The court ordered the defendant removed to the county jail of an adjoining county at Sidney, Montana, and it would appear to have been conducive to his health to have residence in a sanitary jail, and the distance from Sidney to Glendive where one of counsel for defendant had his office is little different than the distance from Circle to Glendive.

Finally the record is not preserved as to the number of talesmen called and challenges used by the appellant in obtaining the jury. We deem this important in determining whether or not there has been abuse of discretion. Since we cannot make any determination on the record before us we must assume that the appellant did not have to exhaust his challenges before obtaining a jury for the trial. State v. Hoffman, supra.

We have carefully examined the record of the trial before the jury, and we fail to find any instance where any bias or prejudice on the part of the court is evident therein. To our mind he was at all times careful to preserve the rights of the appellant and conducted the trial in a fair and impartial manner.

No abuse of discretion appearing, we hold no error evident.

Specifications of error three and four contend that the trial court erred in denying appellant's motions to vacate leave to file information direct and to quash the information, on the ground that there is no sufficient factual showing made to the court to move its discretion to grant leave to file the information direct.

The motion for leave to file the information presented by the county attorney to the court disclosed that Clement A. Myzska had been shot at close range with a highpowered rifle and killed on the London farm; that a coroner's jury returned a verdict that the killing of the decedent was intentional; that a hearing had been previously held before the court, being the habeas corpus hearing, at which evidence was introduced showing the commission of the crime and the guilt of the defendant; that the county attorney had conducted an investigation, interviewed more than twenty-five witnesses, inspected the physical evidence, viewed and investigated the premises, and that as a re-

sult of these facts he had reasonable grounds to believe, and did believe that the defendant was guilty of the crime of murder.

This court said in State v. Kacar, 74 Mont. 269, 240 Pac. 365, 367:

"In the written request the county attorney represented to the court, among other things, that the defendant had been arrested, accused of the crime of murder alleged to have been committed in Silver Bow County, and that he had conversed with the witnesses on behalf of the state with reference to the accusation, and from his investigation he was satisfied 'that the defendant is guilty as charged'. The court deemed the written request sufficient and we think it exercised its discretion properly in so doing."

This court later reviewed many of the cases upon this point in State ex rel. Juhl v. District Court, 107 Mont. 309, 84 Pac. (2d) 979, 120 A.L.R. 353, and held that the granting of the request is not a mere perfunctory matter, but facts must be shown to move the discretion of the court to grant the leave.

In this case we believe that the county attorney has set forth ▇ sufficient facts in his motion to move the discretion of the court in line without previous holdings, and we fail to find that the court has abused its discretion in any manner.

Appellant's specification of error five deals with the overruling of the demurrer to the information which was filed by the appellant. It is the contention of the appellant that the case of State v. Hale, Mont., 291, Pac. (2d) 229, followed by the case of State v. MacLean, Mont., 291 Pac. (2d) 250, have changed the previously settled law of this state and that now an information for murder must comply with the rules laid down in those two cases, both of which had to do with the charge of fraud or false pretenses under our statutes.

That such is not now the law must be apparent to counsel since the opinion in State v. Duncan, Mont., 305 Pac. (2d) 761, recently issued by this court. While that case involves a manslaughter information, the same principles therein announced apply to an information charging murder. It is unnecessary to

further discuss the matter other than to say that the information herein is sufficient and the ruling of the district court upon the demurrer was correct.

Appellant's specification of error six and seven are grounded upon the contention that the state failed to prove the defendant committed an unlawful act with malice aforethought, either express or implied, and that by reason thereof the court erred in denying appellant's two motions made at the conclusion of the state's case in chief to withdraw from the jury's consideration the charge of murder in the first degree or second degree, and that likewise the court erred in refusing to give two instructions requested by the appellant to the same effect.

Appellant contends vigorously that because the testimony tended to show that Floyd London had had no previous quarrel with the deceased and had treated him well, no malice existed and therefore no murder was committed.

In our mind it is not necessary to show pre-existing malice ▮▮▮▮ against the deceased. Malice may be shown directly, or may be inferred from a lack of provocation. State v. Roberts, 44 Mont. 243, 119 Pac. 566. Premeditation may be formed momentarily. State v. Cates, 97 Mont. 173, 33 Pac. (2d) 578; State v. Palen, 119 Mont. 600, 178 Pac. (2d) 862.

There is evidence in the record here that the appellant was ▮▮▮▮ present when his son armed himself; that he was aware of a threat to the effect that someone was gunning for them; that he went with his son to his farm to find out who this person was; upon arrival there he armed himself; that each employee was interrogated; that while holding guns upon one of their employees the decedent was called, and upon his entering the place where appellant and the others were assembled the appellant shot him. Appellant was bent upon getting to the bottom of things, he was armed for that purpose, and he shot and killed a fellow man. It is hard to conceive of any humanitarian motive in the actions of the appellant. They appear to be those of one who was up to no good, and malicious in that no provocation

430

appeared for the shooting; the act would appear to have been that of one with an abandoned and malignant heart.

Appellant's specification of error number eight is directed to the preparation and admission of certain state's exhibits, being a model of the ranch house and plats of the premises. These exhibits were prepared by a competent engineer to aid in presentation of the case to the jury, to delineate the places and things which were testified to by the witnesses. We find no merit in the contentions of the appellant. As was stated in State v. Byrne, 60 Mont. 317, 325, 199 Pac. 262, 264;

" 'On a trial for assault with intent to kill, a map of the *locus in quo,* shown to have been made by a competent surveyor, who was also a disinterested person, was competent, though made at the direction of the district attorney, to illustrate his theory of the case'. State v. Remington, 50 Or. 99, 91 Pac. 473. Maps and photographs showing the topography of the place of the homicide are admissible. People v. Phelan, 123 Cal. 551, 56 Pac. 424. The general rule with reference to the admissibility of maps and diagrams appears to be: 'Unofficial maps, diagrams, plats, or plans representing things which cannot be as conveniently and as clearly described by witnesses, when proven to be correct, or when offered in connection with the testimony of a witness, are admissible as legitimate aids to the court and jury. A showing of the approximate correctness is sufficient'. 16 C.J. 745. The map in the present case, State's Exhibit B, was made by the county surveyor, and testified to by him as being correct."

There is no charge that any of the exhibits complained of were not true and correct and portrayed what they were intended to portray. We hold that these exhibits were correctly received in evidence, and the motions to suppress them were not well taken.

Specification of error No. 9 deals with the sustaining of an objection to a question put on cross-examination to the witness Rauen, the question being: "Do you feel bitter toward the defendant?"

The scope of cross-examination as to interest of the witness

 is very largely in the discretion of the trial court, and ordinarily latitude should be allowed. In this case it was shown that this witness who was nineteen years old, was a boyhood chum of the deceased, a high school student who was seventeen years old; that they came to Montana together on this vacation trip, and the witness was present on the premises at the time his chum was shot and killed. To ask the question is to answer it. This was the only question asked along this line. We concur in the following:

"The interest of the witness in the controversy is always a proper subject of cross-examination. It would have been well if the court had allowed the question to be answered, but the relationship of the witness to the deceased, already disclosed by the evidence, was sufficient to show his interest in the prosecution of the defendant. The extent of cross-examination of witnesses as to their interest in the controversy is very largely in the discretion of the trial court and such interest is often made the excuse for lengthy cross-examination upon wholly immaterial matter. There was no prejudicial error in the refusal to permit the witness to answer the question." People v. Wong Toy, 189 Cal. 587, 209 Pac. 543, 545.

Appellant's specification of error No. 10 contends that the court erred in admitting over objection in the testimony of the witness Schafer that he had been offered $500 by Mrs. London, wife of the appellant.

The situation in this regard is that upon re-cross-examination of the witness these questions were asked:

"Q. Did any member of the London family every tell you to say anything untrue? A. No, sir. * * *

"Q. Did any of the people I have mentioned to you, either attorneys, Mr. London, that is Mr. Floyd London, Billy London, or any member of that family tell you to state any particular fact in this case? A. No, sir."

On re-direct examination the witness was asked:

"Q. Did any member of the London family ever talk to you about this case? A. We have talked about it, yes."

After further examination touching upon the persons present and the circumstances of such conversation, the witness testified referring to Mrs. London and her daughter-in-law. ''They said, well if you will stick beside us they would do anything in the world for me.'' As a part of the same conversation Mrs. London offered him $500.

The matter of the absence of any influence exerted by members of the London family upon the witness was brought out by the appellant upon cross-examination. It was then the privilege of the state to make such inquiry as it deemed proper into the subject of influence by members of the family. R.C.M. 1947, section 93-1901-7 and 93-1901-10. See, also, State v. Heaston, 109 Mont., 303, 97 Pac. (2d) 330. The evidence was properly admitted.

By specification of error No. 11, it is urged that the court erred in requiring the witness, Billy London, to demonstrate before the jury with state's exhibit 1 that the exhibit could be discharged accidentally.

The witness, Billy London, had testified that the gun with which the deceased was killed had discharged accidentally some time previously while being carried in a pickup. The witness was handed the gun and asked to set it off without depressing the trigger. Objection was made that the gun now had a rubber butt on it and was different than at the time it went off accidentally. The issue was whether or not the gun had discharged accidentally, in its then condition, being admittedly the same as it was on the day of the shooting, and the objection was not well taken. The experiment was allowed by the trial court and appellant contends now and contended at the trial that the gun did go off when the witness struck the butt to the floor. This fact was certainly not prejudicial to the appellant. It would appear to have been most favorable. The matter of permitting experiments and demonstrations is one addressed to the discretion of the trial court and its action will not be disturbed where substantial similarity of condition exists. State v. Keller, 126 Mont. 142, 246 Pac. (2d) 817.

Specifications of error No. 12 through No. 31, deal with instructions involving the refusal of the court to give requested instructions, and in the giving of instructions objected to by the appellant. We have examined all of the instructions given by the court and conclude that, as a whole, they fairly covered and adequately expressed the law applicable to the case under the evidence produced therein. As we stated in State v. Messerly, 126 Mont. 62, 244 Pac. (2d) 1054, 1057:

"A discussion of each of the instructions given over defendant's objection, and each of defendant's instructions refused, would unduly extend this opinion. We have examined all of the instructions given and we are of the opinion that the jury was fully and fairly instructed as to the law applicable to this case. The instructions refused were either covered by given instructions or were not applicable. When instructions as a whole correctly state the law, error does not exist."

We will, however, discuss some of the refused instructions which appellant insists were erroneously refused.

Appellant contends that the jury was not instructed that if the shooting was accidental he was entitled to a verdict of not guilty. This theory is based upon the holding of this court in State v. Smith, 126 Mont. 124, 246 Pac. (2d) 227, an assault case. The jury in this case was instructed on the elements of excusable homicide. Appellant contends this was not sufficient, and that under the evidence herein he was entitled to have the jury told that if the shooting was done accidentally, he should be acquitted.

We do not believe he was so entitled. This court stated in State v. Kuum, 55 Mont. 436, 178 Pac. 288, 291, that:

"If one person presents a loaded firearm at another, with a purpose to do the other an injury or put him in fear, he is guilty of doing an unlawful act, for it amounts to an assault. State v. Barry, 45 Mont. 598, 124 Pac. 775, 41 L.R.A., N.S., 181; State v. Papp, 51 Mont. 405, 153 Pac. 279. But if the pointing of the weapon is accidental, or if there is no purpose or intention to injure the other by putting him in fear or otherwise, the act is

not unlawful, in the sense that it is a crime punishable by law.

"This conclusion, however, does not render necessary the additional conclusion that the homicide was excusable. It was still a question to be resolved by the jury whether the defendant was exercising usual and ordinary caution in handling the revolver as he did."

We believe under the evidence here what was said in that case applies.

Specification No. 17 claims error in the court's refusal to give the following instruction:

"If the evidence fails to show any motive on the part of the accused to commit the crime charged in the information, this is a circumstance in favor of his innocence which the jury ought to consider, together with all the other facts and circumstances, in making up their verdict."

This requested instruction is the first sentence of one requested in State v. Lu Sing, 34 Mont. 31, 85 Pac. 521. The instruction was refused in that case as a comment upon the weight of the evidence and an unwarranted invasion of the province of the jury. By way of *obiter dictum* this court stated in that opinion that the first sentence of the requested instruction, that embodied in the instruction above quoted, correctly stated the law.

In Fields v. State, 154 Ark. 188, 241 S.W. 901, the instruction as requested in this case was there rejected as argumentative in form and tending to invade the province of the jury.

We are impressed with the holding of the court in State v. Aitken, 240 Mo. 254, 144 S.W. 499, 503, wherein it is stated:

"Motive is a material consideration in a case of circumstantial evidence, and is a proper matter for argument before the jury. Its absence does not prove innocence; nor does the mere fact that it exists establish guilt. Motive is a circumstance for or against the defendant as the jury may find that it does not or does exist; and is to be weighed together with all other facts and circumstances in evidence. It does not follow from the fact that a circumstance is material that a jury must be instructed

especially upon that circumstance. Nor does it follow that failure to instruct is error because it would not be error to instruct on the point. \* \* \* It was not error to fail to instruct on motive, which is but one of all the circumstances to be considered by the jury, and does not require a special instruction." This holding was followed by that court in State v. Glenn, Mo., 262 S.W. 1030. Therein it was stated that such instructions are argumentative, and a comment on the evidence.

What we have said here applies with equal force to the two other requested instructions along the same line and covered by specifications Nos. 18 and 19.

In addition we might state that none of these requested instructions took into consideration the crime of involuntary manslaughter, in which the presence or absence of motive would have no bearing.

The court refused to give appellant's requested instruction No. 25, reading:

"You are instructed that the defendant, Floyd C. London, had the right to refuse to testify at the coroner's inquest and you may not use the fact of his refusal to testify to his prejudice, and the prosecution must not comment to the court or the jury on the same."

The court properly instructed the jury that the defendant in a criminal case cannot be compelled to be a witness against himself.

At the trial the transcript of the coroner's inquest was used on cross-examination by appellant to impeach a state's witness. At the close of the redirect examination the state offered the whole transcript in evidence. At the request of counsel for the appellant the verdict was removed from the transcript and the balance offered and received in evidence without objection. Appellant was the first to inject the transcript into the case, and he allowed the record to be put in evidence without objection. It then became a part of the evidence, and to request the court to instruct the jury that counsel could not comment upon the same appears to be a very strained construction of our

law. The privilege of not having to testify against oneself is waived by taking the stand and testifying. The appellant took the stand in his case. Thereby, he placed before the jury his version of the happenings, and having done so all of his prior actions with regard to the matter were a proper subject of inquiry, examination and comment. The court did not err in refusing the requested instruction.

Considering court's instruction No. 30, which reads: "Duly qualified experts may give their opinions on questions in controversy at this trial. To assist you in deciding such questions, you may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. You are not bound to accept the opinion of an expert as conclusive, but you should give to it the weight to which you shall find it to be entitled. You may disregard any such opinion, if you find it to be unreasonable."

Appellant contends that this instruction informs the jury that they may disregard and discredit the testimony of experts. While it is true that "The law makes no distinction in weighing evidence between expert testimony and evidence of other character. It is for the trier of the facts to determine the weight to be given to any evidence." Weakley v. Cook, 126 Mont. 332, 249 Pac. (2d) 926, 928. To our mind the instruction does no more than tell the jury that expert opinions are to be received and weighed on the same basis as other testimony. This particular instruction is patterned after section 1127b of the California Penal Code, adopted by that state in 1929, and since then used in all cases requiring an instruction upon expert witnesses. While appellant relies heavily upon the case of Hirshfield v. Dana, 193 Cal. 142, 223 Pac. 451, that case was decided in 1924. There is no similarity between the instruction given by the court in this case and the ones therein criticized.

Since opinions of experts are admitted under a special provision of our code, R.C.M. 1947, section 93-401-27, subd. 9, we believe that the court in a proper case should instruct the jury as to such testimony in order that they may have a guide

to the manner in which they should consider and weigh the opinions of such experts. This appearing to be such a case, we deem the instruction proper.

By specification No. 32, error is claimed in the admission of exhibits Nos. 2, 3, 4 and 8, being three guns and a magazine which were delivered to the sheriff by the Londons immediately on their arrival in Circle following the shooting. Exhibit No. 1, the .270 caliber Winchester rifle fired by appellant was the other gun delivered to the sheriff, and it was admitted in evidence.

As to exhibit No. 2, the .30-30 rifle purchased the same day by Billy London in Circle immediately prior to the shooting, and which gun Billy London had in his hand at the time of the shooting, and with which he had assaulted one of the employees, there could be no question as to its relevancy. It was directly connected with the commission of the crime.

As to exhibit No. 8, this was the .22 rifle which the appellant stated he got out of the closet at the same time he got the .270 Winchester. He testified further that he delivered that gun to his son immediately prior to the shooting, and at the time of the shooting it was held by his son in one of his hands at the immediate point where the killing took place. Once again we have a direct connection between the exhibit and the commission of the crime.

As to exhibits Nos. 3 and 4, being the .25 caliber pistol and its magazine, owned by the deceased, this weapon was injected into the case by the appellant as he requested Troy Crosley to get this pistol from the personal effects of the deceased immediately after the shooting. The appellant himself placed the pistol in his pickup and brought it to Circle and delivered it to the sheriff. It must be born in mind that the appellant and his son had been searching for some employee of theirs who was looking for them, or one of them, with a weapon. We fail to see how any error can be charged in bringing before the jury the very instrumentality that the appellant himself wanted brought to the attention of the sheriff immediately following the shooting.

438

Under the opinions of this court in State v. Harris, 66 Mont. 34, 213 Pac. 215, State v. Allison, 122 Mont. 120, 199 Pac. (2d) 279, and State v. Simons, 126 Mont. 218, 247 Pac. (2d) 481, the weapons were sufficiently connected with the appellant and the time and place of the commission of the crime to be received in evidence.

We do not find any prejudicial error in the record before us on this appeal. Accordingly the judgment is affirmed.

MR. JUSTICES CASTLES, BOTTOMLY, ANGSTMAN and ADAIR, concur.